**CASE NO. 19-5094**
**UNITED STATES COURT OF APPEALS**
**THE TENTH CIRCUIT**

---

**MARK ANTHONY PALZER,**

**Plaintiff/Appellant,**

**v.**

**COXCOM, LLC,**

**Defendant/Appellee.**

---

On Appeal from the United States District Court
for the Northern District of Oklahoma
Honorable Gregory K. Frizzell, District Judge
District Court Case No. 15-CV-564-GKF-JFJ

---

**APPELLANT'S OPENING BRIEF**

---

**Christopher Lincoln Camp, OBA #18541**
**CAMP LAW FIRM**
**7122 South Sheridan Road, Suite #2-382**
**Tulsa, Oklahoma  74133**
**Telephone: (918) 200-4871**
**E-mail: camplawfirm@gmail.com**

---

**STATEMENT AS TO ORAL ARGUMENTS**
Oral arguments are not requested.

# TABLE OF CONTENTS

Table of Contents.................................................................................................i

Table of Authorities........................................................................................ iii

Statement of Related Cases ..............................................................................1

Jurisdictional Statement....................................................................................1

Summary of Argument and
Statement of Issues Presented for Review........................................................2

Statement of the Case .......................................................................................4

Statement of Facts
Relevant to Issues Presented for Review...........................................................5

      A.  Cox's Policies ......................................................................... 5

      B.  Module Assignments .............................................................. 9

      C.  Manifestations of Stauffer's Discriminatory Animus ............... 18

      D.  Cox's Violation of Its Own EEO Policies
           & Failure to Investigate Complaints of Workplace Discrimination..........21

          (i)  June 2012 Complaint ....................................................... 21

          (ii) August 2012 Complaint.................................................. 24

          (iii)December 2012 Complaint.............................................. 24

          (iv)False Statements that Cox Made to EEOC .......................27

      E.  Mark Palzer's Job Performance................................................ 28

      F.  Disparate Treatment ............................................................... 34

Standard of Review .........................................................................................38

Arguments and Authorities..............................................................................39

I.      The District Court abused its discretion in striking
        *Plaintiff's Response to Defendant's Motion for Summary
        Judgment* in its entirety..................................................................39


II.     The District Court impermissibly resolved, in movants'
        favor, all disputed facts and inferences relating to the issue
        of pretext, ignored all of Palzer's evidence that raised triable
        issues, and otherwise failed to adhere to the proper standards
        for evaluating evidence at the summary judgment stage....................53

        A.  Applicable Law.................................................................54

        B.  Palzer produced evidence that Cox's "legitimate, non-discriminatory
            Reason" for terminating his employment is unworthy of credence
            and constitutes evidence of pretext.......................................55

        C.  The District committed reversible error in holding that "Campbell,
            Crawford, Finnefrock, and Young were not similarly situated"
            to Palzer .........................................................................61

        D.  The District Court erred in holding that Stauffer's membership in
            the protected class was dispositive of the issue of pretext .................64


III.    The District Court erred in denying Palzder's *Objection to
        Magistrate Judge's October 3rd Order Denying Motion to Compel
        Compliance with Fed.R.Civ.P. 30(b)(6)* ....................................66

Statement Concerning Oral Argument ...............................................66

Certificate of Compliance with Type-Volume Limit .......................................67

Certificate of Digital Submission .....................................................68

Certificate of Service ................................................................69


Attachment 1 – 09-17-19 *Order* [Dkt. 171] ...............................................Tab 1

Attachment 2 - 09-17-19 *Judgment* [Dkt. 172] .........................................Tab 2

Attachment 3 - 04-26-19 *Order* [Dkt. 164] .................................................Tab 3

Attachment 4 – 05-01-19 *Order* [Dkt. 165] ................................................Tab 4

## **TABLE OF AUTHORITIES**

### **CASES**

*Adams v. Denver Health & Hospital Authority*
2016 WL 1247732 (D.Colo.).................................................................58

*Alfonso v. SCC Pueblo Belmont Operating Co., LLC*
912 F.Supp.2d 1018 (D.Colo. 2012) ..................................................60

*Avila v. Jostens, Inc.*
316 Fed.Appx. 826 (10th Cir. 2009) ..................................................60

*Beaird v. Seagate Tech, Inc.*
145 F.3d 1159 (10th Cir. 1998) ..........................................................62

*Bell v. Bolger*
708 F.2d 1312 (8th Cir. 1983) ............................................................62

*Berry v. Stevinson Chevrolet*
74 F.3d 980 (10th Cir. 1996) ..............................................................56

*Burghy v. Dayton Racquet Club, Inc.*
695 F.Supp.2d 689 (S.D.Ohio).............................................................50

*Burns v. AAF-McQuay, Inc.*
96 F.3d 728 (4th Cir. 1996) ................................................................59

*Burrus v. United Tele. Co. of Kansas, Inc.*
683 F.2d 339 (10th Cir. 1982) ............................................................61

*Burton v. Freescale Semiconductor, Inc.*
798 F.3d 222 (5th Cir. 2015) ..............................................................61

*Castleman v. Acme Boot Co.*
959 F.2d 1417 (7th Cir. 1992)......................................................58 & 59

*Chase Home Finance LLC v. Gravitt*
350 P.3d 401 (Okla.Civ.App. 2015) ...................................................40

*Christie v. Foremost Ins. Co.*
785 F.2d 584 (7th Cir. 1986) ..............................................................61

*Coco v. Elmwood Care, Inc.*
128 F.3d 1177 (7th Cir. 1997) ................................................................................61

*Coletti v. Cudd Pressure Control*
165 F.3d 767 (10th Cir. 1999) ................................................................................60

*Cone v. Longmont United Hosp. Ass'n,*
14 F.3d 526 (10th Cir. 1994) ................................................................................40

*Denesha v. Farmers Ins. Exch.*
161 F.3d 491 (8th Cir. 1998) ................................................................................61

*Dey v. Colt Construction & Development Co.*
28 F.3d 1446 (7th Cir. 1994) ................................................................................59

*Dillard v. Fieldcrest Cannon, Inc.*
7 F.3d 223, 1993 WL 393339 (4th Cir. 1993) ................................................................................54

*Dominguez v. Suttle Caribe*
202 F.3d 424 (1st Cir. 2000) ................................................................................59

*Doyle v. Murray*
938 F.2d 33 (4th Cir. 1991) ................................................................................44

*E.E.O.C. v. Alton Packaging Corp.*
901 F.2d 920 (11th Cir. 1990) ................................................................................60

*E.E.O.C. v. C.R. England, Inc.*
644 F.3d 1028 (10th Cir. 2011) ................................................................................58

*Ehrenhaus v. Reynolds*
965 F.2d 916 (10th Cir. 1992) ................................................................................54

*Elmore v. Capstan, Inc.*
58 F.3d 525 (10th Cir. 1995) ................................................................................56

*Elrod v. Sears, Roebuck and Co.*
939 F.2d 1466 (11th Cir. 1991) ................................................................................67

*Estate of Bassatt v. Denver City/Co. School Dist. No. 1*
775 F.3d 1233 (10th Cir. 2014) ................................................................................59

*Evans v. Lopez*
2000 WL 631357 (N.D.Ill.) ................................................................................41

iv

*Fairbrother v. Orkin Exterminating Co., Inc.*
2003 WL 192480 (D.Kan.) .................................................................61

*Francis v. Esper*
2018 WL 2269904 (E.D.N.C.) ...........................................................41

*Garrison v. Gambro, Inc.*
428 F.3d 933 (10th Cir. 2005) ...........................................................55

*Giacoletto v. Amax Zinc Co., Inc.*
954 F.2d 424 (7th Cir. 1992) .............................................................61

*Greene v. Safeway Stores, Inc.*
9 F.3d 554 (10th Cir. 1996) ...............................................................60

*Grisham v. Frito-Lay, Inc.*
1981 WL 184 (D.Kan.) ...............................................................57 & 64

*Garrett v. Hewlett-Packard Co.*
305 F.3d 1210 (10th Cir. 2002) ..........................................................58

*Hooks v. Lockheed Martin Skunk Works*
114 Fed.Appx. 769 (9th Cir. 2001) .....................................................59

*Humphries v. CBOCS West, Inc.*
474 F.3d 387 (7th Cir. 2007) .............................................................64

*In re Baker*
744 F.2d 1438 (10th Cir. 1984) ..........................................................53

*Jackson v. J.R. Simplot Co.*
666 Fed.Appx. 739, 2016 WL 7240136 (10th Cir. 2016) .................57 & 58

*James v. Sears, Roebuck & Co., Inc.*
21 F.3d 989 (10th Cir. 1994) .............................................................56

*Jeffries v. State Kansas, Dept. of Social and Rehab. Services*
946 F.Supp. 1556 (D.Kan. 1996) .......................................................40

*Johnson v. Dayton Elec. Mfg. Co.*
140 F.3d 781 (8th Cir. 1998) .............................................................50

*Johnson v. Graves*
2008 WL 694730 (S.D.Tex.) ..............................................................50

*Johnson v. Outback Steakhouse of Florida, Inc.*
328 F.Supp.2d 1115 (D.Kan. 2004) ..................................................57 & 64

*Kendrick v. Penske Transp. Services, Inc.*
220 F.3d 1220 (10th Cir. 2000) ......................................................57 & 64

*Kresnak v. City of Muskegon Heights*
956 F.Supp. 1327 (W.D.Mich. 1997) ...........................................61

*Lee v. Max Intern., LLC*
638 F.3d 1318 (10th Cir. 2011) ......................................................54

*Luke v. Hospital Shared Services, Inc.*
2013 WL 1136937 (10th Cir.) .........................................................39

*Luster v. Vilsack*
667 F.3d 1089 (10th Cir. 2011) ......................................................56

*M&M Poultry, Inc. v. Pilgrim's Pride Corp.*
2017 WL 11457967 (N.D.W.V.) ......................................................41

*McCullough v. Xerox Corp.*
2015 WL 5769620 (N.D.Cal.) .........................................................62

*Martin v. Toledo Cardiology Consultants, Inc.*
548 F.3d 405 (6th Cir. 2008) .........................................................64

*Mendelsohn v. Sprint/United Mgmt. Co.*
466 F.3d 1223 (10th Cir. 2006) ......................................................60

*Messick v. Horizon Industries, Inc.*
62 F.3d 1227 (9th Cir. 1995) .........................................................62

*Moore v. Jay*
2018 WL 1145945 (W.D.Okla.) ......................................................46

*Murphy v. City of Tulsa*
295 F.Supp.3d 1221 (N.D.Okla. 2018)...........................................47

*Nealis v. CoxCom, LLC*
2017 WL 1091786 (N.D.Okla.) ....................................................42 & 43

*Patel v. OMH Medical Ctr., Inc.*
987 P.2d 1185 (Okla. 1999) .......................................................40 & 41

*Paul Transportation, Inc. v. Andrews*
2014 WL 12843526 (W.D.Okla.) ...................................................................54

*Perez v. El Tequila, LLC*
847 F.3d 1247 (10th Cir. 2017) ....................................................................50

*Phelps v. Hamilton*
122 F.3d 1309 (10th Cir. 1997) ....................................................................40

*Porter v. West Side Restaurant, LLC*
2014 WL 1642152 (D.Kan.)..........................................................................41

*Pradhan v. Al-Sabah*
299 F.Supp.2d 493 (D.Md.) ..........................................................................54

*Priddy v. Federal Express Corp.*
2006 WL 8435828 (W.D.Tenn.) ...................................................................60

*Proctor v. U.P.S.*
502 F.3d 1200 (10th Cir. 2007) ....................................................................58

*Puerto Rico American Ins. Co. v. Rivera-Vazquez*
603 F.3d 125 (1st Cir. 2010) .........................................................................49

*Reeves v. Sanderson Plumbing Products, Inc.*
530 U.S. 133 (2000) ......................................................................................60

*Sassaman v. Gamache*
566 F.3d 307 (2nd Cir. 2009) ........................................................................59

*Shaw v. Klinkhamer*
2005 WL 1651179 (N.D.Ill.) .........................................................................57

*Swackhammer v. Sprint/United Mgmt. Co.*
493 F.3d 1160 (10th Cir. 2007)...............................................................56 & 57

*Texas Dept. of Community Affairs v. Burdine,*
450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ...............................56

*Toth v. Gates Rubber Co.*
216 F.3d 1088, 2000 WL 796068 (10th Cir.) ..............................................57

*U.S. v. $96,030.00 in U.S. Currency*
2006 WL 3813590 (D.Utah) ..........................................................................54

*White v. York Int'l Corp.*
45 F.3d 357 (10th Cir. 1995) ...........................................................................55

*Wight v. BankAmerica Corp.*
219 F.3d 79 (2d Cir. 2000) ..............................................................................49

*Willnerd v. First Nat. Nebraska, Inc.*
555 F.3d 770 (8th Cir. 2009) ...........................................................................61

*Zosimo v. Delvalle*
22 F.Supp.2d 42 (E.D.N.Y. 1998) ....................................................................60

## STATUTES & COURT RULES

10th Cir. R. 28.2 ................................................................................................1

28 U.S.C. § 1331 ...............................................................................................2

28 U.S.C. § 1343 ...............................................................................................2

28 U.S.C. § 1441 ...............................................................................................2

29 U.S.C. § 621 .................................................................................................1

42 U.S.C. § 2000e .............................................................................................1

FED.R.APP.P. 4 .................................................................................................2

FED.R.CIV.P. 56 ...............................................................................39, 45, 47

LCvR 56.1 .......................................................................................................47

## STATEMENT OF RELATED CASES

Under 10th Cir. R. 28.2(C)(1), Plaintiff Mark Palzer ("Palzer" or "Appellant") states there has been one prior related appeal:

| | |
|---|---|
| **Case Number** | 16-5021 |
| **Case Name** | *Mark Anthony Palzer v. Cox Oklahoma Telecom, LLC, et al.* |
| **Appealed From** | U.S. District Court (N.D.Okla.) Case No. 15-CV-000564-GKF-JFJ |
| **Appellant** | Mark Anthony Palzer |
| **Panel** | Hon. Paul Joseph Kelly, Jr.<br>Hon. Neil Gorsuch<br>Hon. Scott Matheson, Jr. |
| **Outcome** | Tenth Circuit reversed Judge Frizzell's *Order* **[0112]** dismissing case, finding district court had shown "manifest disregard" for state court's decision "grant[ing] Mr. Palzer an additional 30 days to complete service," and had "abused its discretion in dismissing the suit instead of giving Mr. Palzer the opportunity to effect service under federal law." **[0116-0121]** |

## JURISDICTIONAL STATEMENT

This action arises under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* **[0024]** The acts upon which Appellant's claims are based occurred within the judicial district of the

Northern District of Oklahoma.  The District Court had jurisdiction over

Palzer's case below under 28 U.S.C. §§ 1331, 1343, and 1441.  This Court has

jurisdiction to hear this appeal under 28 U.S.C. § 1291.

On September 17, 2019, the Honorable Gregory K. Frizzell entered his

*Order* **[2490]** granting the summary judgment motion filed by Defendant

CoxCom, LLC ("Cox" or "Appellee"), followed by the *Judgment* **[2520]**

terminating the case.  Under Fed.R.App.P. 4(a)(1), Palzer timely filed his

*Notice of Appeal* **[2521]** on October 17, 2019.

## SUMMARY OF ARGUMENT
### AND
### STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. The District Court's *Order* **[2490-2519]** granting summary judgment for

   Appellee CoxCom, LLC, and against Appellant Mark Palzer,

   impermissibly weighed evidence, resolved disputed facts and inferences

   for the Rule 56 movant (Cox), ignored all of Palzer's evidence raising

   triable issues that should have precluded summary judgment, failed to

   disregard all evidence favorable to Defendant which the jury would not

   be required to believe, and otherwise failed to adhere to the standards for

   evaluating evidence at the summary judgment stage.  Appellant asks this

   Court to determine wither the District Court erroneously:

A.    Ignored direct evidence of discrimination produced by Palzer
      [*see* **2512-14**];

B.    Held that Palzer failed to produce evidence of pretext [*see* **2508]-
      11; 2513-14**];

C.    Held that Palzer's response brief "does not satisfy the particularity
      requirement of LCvR 56.1" and that Palzer "failed to support his
      case with adequate specificity" **[2492-93 & n. 3]**;

D.    Held that "Campbell, Crawford, Finnefrock, and Young were not
      similarly situated to [Palzer]" **[2510-11]**; and

E.    Relied on the fact that "the individual who made the
      recommendation to discharge [Palzer], … was also a member of
      the protected class at the time of the employment decision" **[2511]**,
      despite evidence that the same individual was repeatedly heard
      to say there were "too many old, white men" employed at Cox,
      that her sales team was too "white male heavy," that she would
      not consider hiring white applicants, and that she intended to hire
      only people of color. **[2513-14]**

2.  The District Court erred and/or abused its discretion in granting Cox's
    *Motion to Strike Plaintiff's Response to Defendant's Motion for Summary*

*Judgment.* **[2429-2439]**

3. In its *Order* **[2413-2428]**, the District Court erred in denying Palzer's *Objection to Magistrate Judge's October 3rd Order Denying Motion to Compel Compliance with Fed.R.Civ.P. 30(b)(6).*

<u>**STATEMENT OF THE CASE**</u>

Palzer brought the underlying action for discriminatory discharge under Title VII and the ADEA after his employer, Cox, unlawfully terminated Palzer's employment based on his age and race. Palzer is a Caucasian male forty-three years old when Cox hired him as a Customer Service Representative in September 2005. Palzer was promoted to the position of Sales, where a substantial portion of his income was earned on a commission basis.

Prior to being terminated at age fifty-one, Palzer had been reassigned to a new immediate supervisor, Shelley Stauffer ("Stauffer"). Stauffer commented early on that Cox employed too many older white men in her department and that she wanted to fill her team with younger, black men. Stauffer changed how the assignments of sales territories were made, refusing to assign Palzer territories likely to generate new sales, and instead

delegating those territories to young, black male recruits.  Palzer was held to

performance standards far more strict than the standards applied to Palzer's

similarly situated coworkers outside the protected class.   Stauffer also

badgered Palzer about his age, singling him out for extremely hostile and

abusive treatment.   Palzer lodged a formal complaint of age and race

discrimination with Cox's HR department, but his complaints were ignored.

Stauffer's mistreatment and discrimination against Palzer based on his age

and race continued to escalate, ultimately resulting in Cox's termination of

Palzer on June 10, 2013.


## STATEMENT OF FACTS
## RELEVANT TO ISSUES PRESENTED FOR REVIEW

**A.    Cox's Policies**

1.    Cox's EEO Policy prohibits **any** behavior that in any way "adversely

      affects an employee's opportunities with Cox." **[1752(21:7-17);   1465]**

      The EEO policy applies to all aspects of the employment relationship,

      including:

      - Job placement and assignment of responsibilities;
      - Performance evaluation;
      - Professional development opportunities; and
      - Discipline and termination.

**[1481]** Cox will not "tolerate any [verbal or physical] behavior … that would create a … hostile or intimidating working environment." **[1656]**

2.      Cox's *"Open Door" Reporting Policy*, which applies to all Cox employees, provides:

> If you have a job related issue or concern, you should first discuss it with your supervisor or manager. **He or she <u>will make every effort</u> to resolve your concern.**

**[1468]** "Job Related Issues or Concerns" are defined as including any "violations of policy or the Code of Excellence." **[1469]**

3.      Under Cox's *Code of Excellence*, managers and supervisors are responsible for:

     a. Creating and maintaining a work environment free of discrimination, retaliation and harassment;

     b. **Promptly** asking for help about complaints of discrimination, retaliation, or harassment within their departments;

     c. **Reporting discrimination, retaliation, and harassment complaints to HR personnel**; and

     d. Taking corrective action to prevent prohibited conduct from reoccurring.

**52(19:8–21:6); 1466; 1481]**

4.      Similarly, Cox's HR personnel oversee compliance with the EEO policy,

and are required to "**thoroughly and promptly" respond to and investigate** complaints or inquiries regarding employment discrimination or on-the-job harassment. **[1466; 1481; 1651]**

5.  Under Cox's *Code of Excellence*, which was in effect during Plaintiff's employment **[1751-52(17:25–18:8)]**, "[e]mployees who supervise others" are obligated to:

    a. "Monitor compliance by people they supervise;"

    b. "Properly report allegations of noncompliance[;]" and

    c. "Support employees who in good faith raise questions or concerns about compliance and integrity" and to prohibit "retaliation against an employee who speaks up in good faith about questions or concerns[.]"

    **[1465; 1751(16:14–17:21); 1653 & 1656     (requiring supervisory personnel to "tak[e] action to address conduct that is in violation of [Cox's] Code or policies," and to "[m]ake sure employees aren't subjected to retaliation for speaking up")]**

6.  When an employee aggrieved by, or concerned with, what he suspects violates the law, Cox's policies, and/or the *Code*, the most important thing he can do is raise the concern with his supervisor, a manager, Cox HR personnel, or the Ethics Team. **[1648]** Cox's written policies further provide:

We take claims of retaliation quite seriously and will not allow retaliation against a person speaking up in good faith. Allegations of retaliation will be investigated and appropriate action taken. Individuals engaging in retaliatory conduct will be subject to disciplinary action, which may include termination. **[1648]**

7.    It was the policy of Cox to preserve an employee's employment any time it was possible to remedy the situation or to turn around the conduct in question. **[1753(22:21–24:14; 24:20-25)]**

8.    To further that objective, Cox's implemented its *Corrective Action Policy.* **[***See*** **1405-06,¶8; 1753-54(25:23–27:7); 1762(61:25–62:13); 1470-1471; 1668 & 1671;** *see also* **1371; 1797(12:4-25)]**

9.    Although Cox testified it has no policy of progressive discipline **[1963(178:11-23)]**, the *Guidelines* governing administration of the *Corrective Action Policy* by Cox management provide otherwise:

> **In** **all** **cases**, **progressive discipline** **must** follow the [four-step process] **unless** the severity of the action warrants a different step. … **Progressive discipline** is defined as a process for dealing with job-related behavior that does not meet expected and communicated **performance** standards. … The goal of **progressive discipline** is to improve employee performance and/or conduct. **The process … [is intended] to assist the employee** to overcome **performance problems** and **satisfy job expectations**[.] … Employees **will** progress through **progressive disciplinary steps** for unsatisfactory job performance and/or inappropriate employee conduct[.] … Decisions concerning the suspension or discharge of an employee will normally **not** be made **until the situation has been** **investigated to the extent warranted**.

\*    \*    \*

**Corrective Actions are only active for <u>12 months</u> from the date of the written action**, with the exception of Safety Violations and Attendance.

**[1470; *see also* 1480,¶4 (providing that "[d]isciplinary action will normally be used as pertinent for no longer than one year following the last occurrence"); 1965(180:6-17)]**

10. Cox's progressive corrective action policies apply to, and are used to support, the quota performance of its sales personnel. **[1676]**

11. Cox's policies expressly require "[c]onsistency and impartiality … in the application of [the *Corrective Action Policy*]." **[1476]**

## B.    <u>Module Assignments</u>

12. On July 9, 2014, in her response to EEOC Charge No. 564-2014-0643 filed by Plaintiff, Melissa Cruts, on behalf of Cox, stated:

> Each team member was to submit their top 3 desired areas **along with justifications** as to why he/she would be successful in those specific areas. Those were to be submitted to [Stauffer] by March 2, 2012. **[Stauffer] used the following criteria to determine the assigned modules:**
>
> 1.    Requests first
> 2.    Order in which the requests were received
> 3.    In the event that more than one salesperson requested an area, performance was used to break the tie.
>
> [Plaintiff Mark Palzer] and another Account Executive [Chuck Watson, who was approximately 30 years old] both requested the

same zip code. **[Watson] received the zip code <u>as he had submitted his request first</u> and had the highest performance on the team.** [Plaintiff] did not receive his top pick but did receive his second and third requests. [Plaintiff] was not harassed and **did not make allegations of race or age discrimination.**

**[1560;1663; 1844(59:6-18); 1850-51(65:12-66:1); 1960-61(175:17–176:11)]**

13. Although Stauffer told her team members that their requests needed to be submitted by March 2, 2012 **[1483; 1850(65:9-11); 1959 (174:14-16); 1960(175:4-16)]**, she informed no one until after such deadline she would assign zip codes on a "first come, first serve" basis, or that the "[o]rder in which the requests were received" would have any bearing on her decision. **[1845(60:2-18); 1851(66:5-20); 1399(Resp. to Fact No. 24)]**

14. Plaintiff submitted his request (which, as Stauffer required, included factual support and detailed explanations justifying his request) by the March 2nd deadline **[1657; 1850(65:9-11); 1960(175:9-16); 1399(Resp. to Fact No. 24),** *supra***; Fact No. 24,** *infra***]**, and a mere eleven (11) minutes after 30-year-old Charles Watson sent Stauffer an e-mail consisting, in its entirety, of a list of his six zip code preferences. **[1562; 1656; 1657; 2020(235:5-6)]**

15. It was only **after** Stauffer knew it would operate to Plaintiff's disadvantage she decided on using the "[o]rder in which the requests

were received" as a criteria -- an approach that Cox now admits was unfair (particularly to Plaintiff – the only Account Executive negatively affected by it). **[1851(66:5-20); 1911(126:6-18); 1912-14(127:9–129:9); 2001-02(216:1–217:5); 2002(217:19-22)]**   Cox did not inform the EEOC of this.**[1560]**

16.   Further, when deposed, Cox conceded that Plaintiff Mark Palzer was the **only** Account Executive who even submitted a proper zip code request.  Only Palzer's submission was complete and complied with Stauffer's instructions for making a proper request (*i.e.*, by providing Stauffer with justification, explanations, and support for his stated zip code preferences). **[1912(127:4-8); 2000(215:14-25); 2001(216:8-17); 2002(217:6-18); 2003(218:11-14); 2004(219:9-22)]**   Nevertheless, Cox withheld this information from the EEOC. **[1560]**

17.   Cox also chose not to inform the EEOC that (a) Watson's submission was incomplete and deficient, and therefore not a proper request; and (b) that in assigning modules, Stauffer inexplicably overlooked Watson's failure to follow her basic instructions to include a justification for each preference **[1560, 1912(127:4-8); 1961(176:18-23); 2000(215:14-25); 2001(216:8-17); 2002(217:6-18); 2003(218:11-14); 2004(219:9-22)]** –

input that Stauffer claimed was necessary for her decision-making process. [*See* **1568; 1844(59:6-18)**]

18. Although Cox now asserts that submitting a proper request and otherwise meeting the three "criteria [that Stauffer claims to have used] to determine the assigned modules" **[Fact No. 12, *supra*]** was "**not** a guarantee" that an Account Executive would be assigned the zip code he requested as his top choice **[1843(58:3-9); 1912-13(127:9–128:1); 1992(207:12-18); 1993(218:19-20)]**, such assertion conflicts with (a) the position statement Cox sent to the EEOC **[Fact No. 12, *supra*]**, and (b) Cox's own testimony that Watson "received the zip code" that he requested based **exclusively** on two factors: that "he had submitted his request first," and that he allegedly "had the highest performance on the team." **[1960-61(175:25–176:11)]**

19. Cox acknowledges that under the module assignment criteria (which Stauffer neither formulated nor articulated until **after** receiving the Account Executives' submissions **[*see* 1649; 1661; 1663; 1851 (66:5-20); 1902 (117:10-24); 1909-10 (124:10 - 125:19); 1912-14 (127:9 – 129:9); 1960 (175:17-23); 2001-02 (216:18 – 217:5); 2002 (217:19-22)]**), "performance" would **only** be a "**tie-breaker**" -- that is, if two or more team members

12

simultaneously made **proper** requests[1] seeking the same zip code(s)/area. **[***See*** 1560; 1851 (66:21-25); 1913 (128:5-12); 2002-04 (217:23 – 219:22)**]**

20.    Therefore, according to the "methodology" to which Cox claims Stauffer strictly adhered in assigning modules **[1663; 1901-02(116:22 – 117:1); Fact No. 12,** *supra***]**, since Plaintiff was the only Account Executive to make a proper request **[***see*** Fact Nos. 16 & 17,** *supra***]**, there was no "tie" to break, and thus no justification for using Watson's alleged "highest performance on the team" to deny Plaintiff his top zip code preference, 74012. **[2002-04(217:6–219:22)]**

21.    Even if the "methodology" to which Stauffer allegedly adhered had permitted her to compare Plaintiff's "performance" (that is, his calculable "**sales** performance" **[1902(117:10-18)]**) with that of Chuck Watson, Cox acknowledges that:

(a)    it does not know the temporal scope of any such comparison;

(b)    by never articulating the temporal scope she would purportedly use in conducting a tie-breaker, Stauffer could subjectively manipulate who the "top performer" was by altering the time period being examined; and

---

[1]    *See* 1408, *supra.*

13

(c)     Stauffer could discriminate against Plaintiff by adjusting the temporal scope of any performance-based tie-breaker. **[1813(28:16-21); 1852(67:1-17); 1902(117:10-24); 1909-10(124:10-125:19); 1961(176:12-17)]**

22.   If Stauffer had needed to employ a performance-based tie-breaker regarding her assignment of the 74012 zip code, she would have had to consider:

(a) That for the 3rd and 4th Quarters of 2011, Plaintiff's sales averaged 91% of his quota, **exceeding** Charles Watson's 90%. **[1863(78:15-19); 2121]**[2];

(b) That in March 2012 (*i.e.*, the month before Stauffer put the zip code modules into place **[2019(234:1-9)]**, and a full 60 days before Account Executives purportedly were locked into their modules **[1940 (155:15-20)]**), Stauffer sent out an e-mail addressing the monthly sales tallies, stating, "Mark [Palzer] is the clear leader with 134% to plan. Chuck [Watson] finished at 108%," or 26% under Plaintiff **[1566; *see also* 1972(187:2-7); 2010(225:13-25); 2019(234:4-9)]**; and

(c) That in April 2012, Plaintiff hit 130.6% of his quota, the highest of any Account Executive **[1565; 1906(121:14-19); 1907(122:16-21); 2019(234:10-15)]**, and 14.4% higher than Chuck Watson. **[1220]**

23.   Cox acknowledges that the zip codes did not perform equally **[1835(50:8-23)]**, and that Plaintiff's first choice, 74012, was the zip code with the highest sales potential. **[1919-20(134:18–135:25); 2006(221:17-**

---

[2]     Charles Watson began working at Cox in February 2008 **[1562]**, and in July 2011, began working as an Account Executive under Stauffer. **[1861-62 (76:23–77:1)]**

20)]

24. Cox testified that in terms of sales, newer Account Executives are typically neither as productive as established employees, nor able to reach that level of production in the first few months. **[1839(54:18–55:12)]**

25. Cox acknowledges it would not make sense to assign a high-producing area to a new team member, who is "not going to have either as much opportunity or skill or [as many] relationship[s] to maximize the revenue potential for that area." **[1840(55:13-22)]**

26. Nevertheless, in Fall 2012, Stauffer reassigned the module containing the best zip code to new team member Andrew Finnefrock **[1921(136:18-20)]**, although:

    (a) when modules were initially being assigned in early 2012, Plaintiff had submitted a request he be assigned 74012 (along with details justifying his request) **[Fact Nos. 14 & 16, *supra*]**;

    (b) when he learned Watson would be departing Stauffer's team (and thus vacating his module), Plaintiff informed Stauffer and Tim Jenney he was still interested in taking on 74012 and/or the entire

module, and repeatedly followed up with Stauffer regarding his request **[1499-1500, 1510 & 1527-28; 2087; 2069]**

(c)  the sales modules were purportedly implemented to foster the development of key relationships within the assigned areas **[1802(17:7-13)]**;

(d)  Stauffer allegedly considered business that had been developed in a particular area by a member of her team **[1848-49(63:25-64:6)]**; and

(e)  prior to the module program being fully implemented approximately three months earlier (on May 31, 201<u>2</u>), Plaintiff had already begun developing over 100 sale prospects in the 74012 module. **[2087; 1940(155:15-20); 2036-2039]**

27.  Although Cox asserts that it denied Plaintiff's request to be moved to the module Watson left behind because it did not want to reassign a vacant module to any Account Executive already working in another module **[1921(136:4-17)]**, Cox's testimony is that the 29-year-old Finnefrock joined Stauffer's team a month **before** Watson's departure, and was "potentially" already working in another module before being reassigned to Watson's old module. **[1926-28(141:9–143:21)]**

28.  Cox admits that Stauffer could peel the 74012-zip code away from the

remainder of Watson's old module and assign it to Plaintiff, and nothing would have prevented her from doing so.  Cox, however, explained that Stauffer's refusal to reassign 74012 to Plaintiff was attributable to the belief that "when you start picking apart modules, you move away from the intent of having a designated area where they focus on building those relationships." **[1925(140:8-19); 1944(159:14-23)]**[3]

29.    Nevertheless, immediately after Plaintiff's discharge, Stauffer abandoned such belief (if she ever had it) by splitting up Plaintiff's old module and allowing multiple Account Executives to conduct sales in its various zip codes. **[2107-09,¶¶9-13]**

30.    After Plaintiff's termination, Stauffer never required another Account

---

[3]      If Finnefrock was already operating within another module before being re-assigned to Watson's old module, then he and Plaintiff would have been in the same position in terms of the modules from which they were departing – no matter which individual Stauffer chose, upon reassignment, he would be leaving behind the relationships developed in his original module assignment.  If, however, Finnefrock was **not** already operating within another module, Plaintiff was clearly the best choice from the standpoint of "building relationships" **after** reassignment to Watson's old module (as Plaintiff had previously begun development of over 100 sale prospects in that sales territory prior to module implementation 3 months earlier). **[2087; 1940(155:15-20); 2036-2039]**    Indeed, as it played out, Finnefrock's sales-to-quota average was less than 48% over the six-month period beginning November 1, 2012, and ending on April 30, 2013. **[2120-2121]**

Executive (nor displayed any indication she even believed it was possible) to meet the 80% sales threshold while operating exclusively in the module to which she had previously confined Plaintiff. **[2108,¶12]**

## C.   <u>Manifestations of Stauffer's Discriminatory Animus</u>

31.   On March 26, 2012, Stauffer hired Stacy Crawford, a 37-year-old African-American female, and Stauffer's first addition to her team since joining Cox Business in February 2012. **[1562]**

32.   In April 2012, Stauffer told Matt Hughes and Scott Miller that the two Caucasian individuals whom they had referred to Stauffer as prospective employees, and who had formally applied for the positions, would not be considered for employment because, according to Stauffer, Cox Business already had too many white men working for it. **[2087; 2016; 2010; 2123, ¶¶4 & 5]**

33.   On May 26, 2012 Stauffer hired Brian Campbell, a 26-year old African-American. **[2030, ¶ 26]**

34.   That same month, Stauffer told African-American employee Stacy Crawford she wanted "to hire another black guy" and asked Crawford if she knew one that might be interested in applying.  Crawford connected Stauffer with Jakobe Young (a 36-year-old African-American

with whom Crawford had worked at Dish Network). **[2087; 2123]**

35.  Within a matter of days (by May 29, 2012), Stauffer had hired Young. **[2087]**

36.  In early June 2012, as a group of Cox employees were departing Tulsa for a meeting in Oklahoma City, Stauffer stopped the bus on which Plaintiff was riding and berated him in an extremely hostile and abusive manner. **[1608; 2087; 2106]** According to Cox, Stauffer's unwarranted display of anger constituted "workplace violence," as defined and prohibited by Cox's own policies. **[1752-53(21:18–22:15); 1770-71(92:13–96:8);** *see also* **1886 (101:3-9)]**

37.  Stauffer participated in openly ridiculing Plaintiff based on his age in a team meeting that took place on June 13, 2012.  When Account Executive Charles Watson made the statement, "Man, we don't even know how old this guy is," Stauffer laughed aloud and responded to Watson with another jocular comment. **[2087]**

38.  Two days later, on June 15, 2012, Stauffer asked -- and then demanded -- that Plaintiff tell her his age.  Concerned that Stauffer might use his age to discriminate against him in terms of possible advancement opportunities, Plaintiff responded by requesting that Stauffer obtain the

information from Cox HR -- an act for which Stauffer later gave Plaintiff negative marks on his mid-year review. **[2087] Plaintiff** was the only Account Executive about whose age Stauffer inquired. **[*See* 2032, ¶¶ 37-39]**

39.  At a team meeting that took place a few weeks later, Stauffer "got in [Plaintiff's] face" and repeatedly screamed, "Why don't you just resign?" and, "Resign! Resign!" **[2087]**

40.  On August 14, 2012, Plaintiff sent an e-mail to Sales Director Tim Jenney objecting to Stauffer's treatment of him -- treatment that Plaintiff increasingly, and in good faith, believed was discriminatory. **[2087]**[4] The following day, Stauffer called Plaintiff into her office and presented him with a "Final Written Warning" regarding several sales he had closed with either her approval or the approval of another member of management.  Stauffer now claimed that Plaintiff's handling of these accounts violated Cox's "Rules of Engagement" and constituted "inappropriate employee conduct or behavior." **[2087]**

41.  On approximately August 18, 2012, Stauffer hired Andrew Finnefrock,

_____

[4]     Jenney had already been told about Stauffer's "too many old, white men" comment, as well as about the concern that Stauffer was singling out Plaintiff for discriminatory reasons, including based on his race. **[2087]**

a 29-year old Caucasian male.  With the addition of Finnefrock, all the individuals Stauffer had hired were under 40. **[1562]**

42.    On December 28, 2012 -- seven (7) days after Plaintiff notified Cox he was pursuing a Charge of Discrimination with the EEOC **[*see* 1485]** -- Stauffer prepared her first annual evaluation of Plaintiff's performance, giving Plaintiff the most abysmal marks he had ever received during his employment with Cox (although Plaintiff finished 2012 just 1.8% behind the top performer, and despite the considerably poorer performance by Stauffer's younger and/or African-American subordinates, all of whom Stauffer gave positive evaluations that indicated Cox's expectations had been met). **[*See* 1632-1637; 2087; 2120-2121; Fact Nos. 69-76, *infra*]**

## D.  Cox's Violation of Its Own EEO Policies & Failure to Investigate Complaints of Workplace Discrimination

### (i)    June 2012 Complaint

43.    In June 2012, after witnessing Stauffer treat Plaintiff in a hostile, abusive, and discriminatory manner, co-worker Carissa Nealis immediately notified her manager, Tom McPherson, about the situation.  Nealis also contacted Cox's human resources department to report her concerns regarding the mistreatment to which Plaintiff had been subjected in working with Stauffer (about which Plaintiff had previously told Nealis,

21

and which Nealis -- particularly after witnessing it firsthand -- believed constituted unlawful employment discrimination and harassment). **[2106]**

44.    Although it knew that Nealis had complained to McPherson about the workplace discrimination to which Plaintiff was being subjected, Cox never spoke with McPherson about Nealis' complaints or even asked him what Nealis had said. **[1772(98:3-12); 1783(143:13-144:10); 1791-92(6:6 – 7:23)]**

45.    As reflected in the notes that Cruts took during her meeting with Nealis on June 7, 2012 (which Cruts claims accurately reflect what was said in the order it was spoken), Nealis explained her concerns, specifically telling Cruts she felt Stauffer was singling out Plaintiff because of his race. **[1771-72(97:2–98:2); 1773(99:12-18); 1773-74(104:4–106:1); 1608]**

46.    Cruts' June 2012 notes expressly state that Nealis told her, "We have enough white men in the group" **[1608; 1772(99:19-23); 1773(104:4-16); 2011-12(226:21–227:19)]**, and that Cruts was told by Stauffer herself she did not "remember saying the 'White guy' comment," but "may have said it," **[1609; 1774(107:10-23)]**

47.    Anecdotally, Nealis also told Cruts about an incident in which Stauffer

was overheard saying that Cox employed too many old, white men, and that she wished she could replace the ones in her department with young African-Americans. Cox HR told Nealis it understood her concerns, knew the issue, and would take care of the situation. **[2106]**

48. Cox acknowledges that Nealis' complaint to Cruts in June 2012 "could be interpreted as [Nealis] saying that [Plaintiff] was being singled out because he was white" **[1774(106:10-13)]**, and that under such an interpretation, it implicated a violation of Title VII **[1775(111:4-14)]** and "would be a concern." **[1982(197:1-4)]**

49. Cox admitted that the concerns raised by Nealis "would be relevant" to "something [Cox] would look into" as possible race discrimination. **[1781(134:2-10)]**

50. Cox also testified that after Nealis voiced her concerns about Palzer being singled out based on his race, Cruts took "appropriate steps to assure" herself that the "white people" comment was not evidence of race discrimination. **[1773(102:18–103:20); 1781(135:4–136:21)]**

51. When deposed, however, Cruts denied that Nealis or anyone else ever reported Stauffer's statement about Cox employing too many old, white men, and her desire to replace them with young, black men. **[1981(196:1-**

**19); 1982(197:1-4)]**

52. Similarly, over six years after admitting to Cruts she did not **remember** making -- but **may have made** -- the "white guy comment," Stauffer has signed an affidavit (for Cox's pending summary judgment motion) in which she now affirmatively denies making the remark. **[2030-31, ¶29]**

### (ii)    <u>August 2012 Complaint</u>

53. On August 16, 2012, Plaintiff hand-delivered a two-page letter to Cruts expressly stating that "I feel like I am being discriminated against" in favor of a "brand new younger guy," that "I have other recent examples of discriminating behavior I can share," and that "My best explanation is [that Stauffer is] … discriminating against me for other reasons." **[1500-1501]**

### (iii)    <u>December 2012 Complaint</u>

54. On December 21, 2012, Plaintiff sent a fax to Cox HR Manager Heather Romeike that led off with a one-page letter from attorney Jeff Nix. , Nix stated that Plaintiff was pursuing an administrative charge with the EEOC regarding "discrimination in [the] terms and conditions of employment based upon his race, Caucasian, and his age, over 40."  Nix also expressly indicated that a copy of Plaintiff's EEOC paperwork was

enclosed with his letter. **[1485]** The remaining seven pages of the fax to Cox consisted of Plaintiff's completed EEOC intake questionnaire, along with a list of "witness[es] to the alleged discriminatory incidents") **[2087; 1777(121:13-16); 1485; 2087]**

55. While acknowledging that Romeike received the letter (who sent a copy to Cruts), Cox denies that it received the EEOC paperwork that Plaintiff faxed with the letter. Specifically, according to Cruts, Romeike told her that no materials were sent with the letter. **[1777(118:12–119:3)]** Although Cruts' normal practice in such a situation was to notify the sender she did not receive the referenced attachments, she claims that regarding Palzer's submission, she neither did so, nor asked Romeike if she had made an effort to get a copy of Plaintiff's EEOC materials. **[1777-78(121:13–123:1)]**[5]

56. Cox acknowledges that Plaintiff's letter constituted a clear attempt to notify the recipient (*i.e.*, Cox HR) about what Palzer perceived to be the discriminatory terms and conditions of his employment based on his race and age. **[1778(124:3-9)]**

---

[5] Cox testified that it does not know if anyone ever went back to ascertain whether Cox had received the entire fax from Plaintiff. **[1778(123:13-17)]**

57. Cox has admitted under oath that, in violation of its own "Code of Excellence," it conducted **<u>no</u>** investigation regarding the December 21st fax or Plaintiff's concerns he was being subjected to discriminatory treatment based on his race and age. **[1784-85(149:22–151:21)]**

58. Despite clearly having a duty to do so **[1930(145:8–146:10); Fact Nos. 2-6, *supra*]**, **no one** at Cox investigated (thoroughly or otherwise) **any** of the oral or written complaints that Plaintiff made regarding discrimination in the workplace and Stauffer's treatment of him. **[1504; 1784-85(149:22–151:21)]**

59. Although Cruts acknowledged both that Stauffer's "white guy" remarks in 2012 potentially implicated violations of federal anti-discrimination laws **[Fact Nos. 48-49, *supra*]**, and that Cox had subsequently received additional complaints from Plaintiff regarding the discrimination he was experiencing because of his race and/or age **[2087; Fact Nos. 53-55, *supra*]**, while Plaintiff was still employed with Cox, Cruts:

    (a) did nothing more than ask Stauffer if she had made the statement, and accept Stauffer's "diversity" explanation at face value **[2017-18(232:13–233:4)]**, and

(b) **never** looked into whether Stauffer's module assignments, her overwhelmingly poor evaluation of Plaintiff, her rationale for placing Plaintiff on a Performance Improvement Plan, and/or her decision to terminate Plaintiff's employment might have been colored or motivated by discriminatory animus. **[1946(161:9-20); 1959-60(170:15–171:25); 2012-16(227:17–231:5); Fact Nos. 57 & 58,** *supra***; Fact No. 60,** *infra***]**[6]

60. Cruts testified that it was not until **two years later** – and more than a year after Plaintiff's discharge – that Cox, in preparing its response to Plaintiff's EEOC Charge of Discrimination, **first** began looking into the issues Plaintiff had repeatedly raised during his employment. **[1560; 1784-85(148:24–151:21); Fact Nos. 57-59,** *supra***]**

**(iv)** <u>**False Statements that Cox Made to the EEOC in Response to Allegations of Discrimination and Retaliation**</u>

61. In the position statement Cox sent to the EEOC on July 9, 2014, rather

---

[6]    Cox understood at least as far back as August 2012 that Palzer was complaining about Stauffer's discriminatory assignment and reassignment of sales modules **[1500-1501]**, and that litigation regarding the same might ensue. **[1485]**    Cox, however, now claims it does not know whether it possesses, or took any steps to preserve, any records or information regarding Stauffer's criteria or method for reassigning modules when Account Executives were added to or removed from Stauffer's team. **[1946(161:9-20); 1947(162:21-25)]**

than acknowledging Cox's failure to address Palzer's concerns when he initially raised them (*i.e.*, while he was still employed with Cox), Cruts falsely represented that Palzer never "ma[d]e allegations of race or age discrimination," and had never "notified" leadership of **any** issues concerning discrimination based on his race or age." **[1560; 1784-85(148:24–151:21); Fact Nos. 40, 53-56 & 59]**

62. Similarly, in the position statement Cox sent to the EEOC on June 14, 2014 (responding to the administrative charge filed by former employee Carissa Nealis), Cruts falsely denied that Nealis had ever complained about conduct potentially unlawful under Title VII. **[1611]**

## E.  Mark Palzer's Job Performance

63. Each of Plaintiff's annual performance reviews for the years 2009, 2010, and 2011 (*i.e.*, prior to Stauffer's arrival in February 2012) reflect that Plaintiff met Cox's expectations for that year. **[1617, 1620, & 1626]**

64. In 2011, Plaintiff was consistently recognized by Cox for being an outstanding sales producer **[1971(186:10-12)]**, and received seven (7) awards from Cox for finishing the months of January, February, March, April, June, July, and October with the highest sales on his team. **[*See* 1563; 2087; 1855-56(70:18–71:10); 1856-58(71:20–73:21); 1861(76:1-4 &**

**76:14-18)]**

65. When deposed, Cox initially denied knowledge of "any salesperson of the month award." **[1854(69:22–70:3)]**

66. Between the time that Plaintiff became an Account Executive in 2008 and the end of 2011, he never had to be put on a Performance Improvement Plan aside from a single verbal counseling he received in 2010 regarding his install quota (which Plaintiff successfully remedied), **[1868 (83:23–84:5); 0453 (Fact No. 10); 2087]** Additionally, for three of those four years, Plaintiff received a merit raise. **[2087]**

67. Plaintiff finished **ahead** of Larry Scroggins in April 2011 (when Scroggins sold $2,084, or 123% to quota) and June 2011 (when Scroggins sold $1,454, or 86% to quota). **[*see* 1563; 2087; 2120]** The sales performance chart that Cox has produced, however, lists Plaintiff at only $1,611 (95%) for April, and $1,168 (69%) for June. **[2120]** Cox could not explain the discrepancy. **[*See* 1858-59(73:25 – 74:16); 1860(75:12-25)]**

68. Cox's two-page chart **[2120-2121]** -- which Cox has presented as containing accurate numerical data regarding the sales performance of its Account Executives from 2010 to 2014 **[*see* 1821(36:7-19); 2115, ¶18]** -- also contradicts the figures that Stauffer produced to justify (a) placing

Plaintiff on Performance Improvement Plans, and (b) her recommendation that Plaintiff's employment be terminated. **[*See* 2025]** Specifically, on January 9, 2013 **[1578]**, and again at the time of Plaintiff's discharge in June 2013 **[1741]**, Stauffer altered the financial data to erroneously reflect that Plaintiff's sales in April and June 2011 were, respectively, only $1,003 (59%) and $782 (46%).

69. According to Cox' sales performance chart, Plaintiff finished 2012 with Monthly Recurring Charges ("MRC) totaling $16,935.27 (78.4% of quota), second only to Larry Scroggins' total MRC of $17,325.08 (80.2% of quota). **[1831(46:1-5); 1832-33(47:18–48:6); 1870-72(85:24-87:18); 1873 (88:18-22); 1898(113:5-8); 2121]**

70. Individuals who failed to meet the 80% performance threshold in 2012 included 27-year- old African-American Brian Campbell (43.6%), 39-year-old African-American Stacy Crawford (46.4%), 31-year-old Caucasian Andrew Finnefrock (58.8%), and 30-year-old Caucasian Hunter Harris (45.4%). **[2121]**

71. Cox has claimed that Plaintiff's performance was "unacceptable" and failed to "me[et] expectations" in 2012 because he missed the annual performance threshold by 1.6% and "was placed on two PIPs." **[1975-**

**76(190:25–191:13)]**[7] By comparison, Campbell, Crawford, Finnefrock, and Hunter all performed markedly worse than Plaintiff **[2120-2121; Fact No. 76, *infra*]**, coming nowhere near reaching their 80% sales threshold **[Fact No. 70, *supra*]**.  But according to their annual evaluations, they **all** were rated by Cox as having **met expectations** for 2012. **[1982-83(197:15–198:15); Fact No. 74, *infra*]**

72.  Despite the sales figures, on the annual performance reviews prepared by Stauffer, Plaintiff received the lowest overall score (*i.e.*, "Needs Development") on Stauffer's team **[1637]**, with each of the other team members (including African-Americans and those under 40 who **never** met the numerical performance threshold) receiving an overall score indicating that he or she "meets expectations" or "exceeds expectations."**[1982-84(197:7–199:21); 1670, 1676, 1682, 1687, 1693, 1698, 1704-05]**

73.  Likewise, on the components of the performance reviews prepared by Stauffer, Plaintiff was given the **lowest marks**, as well as the **greatest number of low marks**, despite his performance (*i.e.*, finishing second

---

[7]     Although Cox factored Plaintiff's March 2012 PIP **[1571]** into its termination of Plaintiff on June 10, 2013 **[1739]**, it was against Cox's *Corrective Action Policy* to do so. Specifically, after twelve months (or until either March 9, 2013, or June 7, 2013), the March 2012 PIP was no longer "active," having expired after 12 months. **[Fact No. 9, *supra*]**)

overall, and just 1.8% under the top performer).  Specifically, Stauffer gave Plaintiff four (4) "Unsatisfactory Results," four (4) "Needs Development," and only two (2) "Meets Expectations." **[1632-1637; 1873(88:18-22); 1917-18(132:16–133:24)]**

74. By comparison, African-Americans Brian Campbell, Stacy Crawford, and Jakobe Young each received just two (2) "Needs Development" and eight (8) "Meets Expectations," and 31-year-old Caucasian Andrew Finnefrock received one (1) "Needs Development" and nine (9) "Meets Expectations" **[*See* 1666; 1874-1900(89:1–115:20)]**

75. According to Cox's sales performance chart **[2120-2121]**, for the combined period of 2011 and 2012, Plaintiff's average monthly sales exceeded the 80% performance threshold by 3%.  During the same 24-month period, Stauffer's **team** had an overall monthly average of only 61.7%, meeting the monthly 80% threshold only **three** times (in May, July and August of 2013)**. [2120-2121]**

76. During the 29-month period immediately preceding his termination, Plaintiff Mark Palzer's monthly sales performance totals were[8]:

---

8    Cox's 30(b)(6) designee testified that Plaintiff's numbers for August and October of 2012, respectively, were $1,273 (71%) and $391 (22%). **[1736]**

**2011    Sales Performance (Monthly Sales Quota - $1,700)**

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2011 Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sold | 1,882 | 1,419 | 1,939 | > 2,084 | 1,359 | > 1,454 | 2,234 | 1,549 | 1,233 | 2,216 | 1,859 | 967 | 1,677 |
| % of Quota | 111% | 83% | 114% | 123% | 80% | 86% | 131% | 91% | 73% | 130% | 109% | 57% | 99% |
| Reference | 0720 | 1736 | 0720 | 0720; 1563; 2087 | 1736 | 0720; 1563; 2087 | 1736 | 0721 | 0721 | 0721 | 0721 | 1736 | -- |

**2011    3-Month Rolling Averages**

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2011 Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % of Quota Sold | 85% | 72% | 103% | 107% | 107% | 96% | 99% | 103% | 98% | 98% | 104% | 99% | 98% |

**2012    Sales Performance (Monthly Sales Quota - $1,800)**

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2012 Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sold | 623 | 838 | 2,403 | 2,351 | 1,559 | 1,292 | 1,805 | 1,841 | 878 | 1,353 | 1,907 | 1,614 | 1,538 |
| % of Quota | 35% | 47% | 134% | 131% | 87% | 72% | 100% | 102% | 49% | 75% | 106% | 90% | 85% |
| Reference | 0720 | 0720 | 0720 | 0720 | 1736 | 1736 | 1736 | 1580-1607; 1736; 2087 | 1736 | 1736 2087 | 0721 | 0721 | -- |

**2012    3-Month Rolling Averages)**

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2012 Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % of Quota Sold | 67% | 46% | 79% | 104% | 117% | 97% | 86% | 91% | 84% | 75% | 85% | 99% | 86% |

**2013    Sales Performance (Monthly Sales Quota - $1,900)**

|  | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|
| Sold | 2,451 | 806 | 555 | 885 | 883 |
| % of Quota | 129% | 42% | 29% | 47% | 46% |
| Reference | 0720 | 0720 | 0720 | 0720 | 1736 |

**2013    3-Month Rolling Averages**

|  | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|
| % of Quota Sold | 108% | 87% | 67% | 39% | 41% |

**F. Disparate Treatment**

77. According to Cox, it measures sales performance using a "rolling" three-month period. **[0453 (Fact No. 9)]** An Account Executive who consistently averages at least 80% of his monthly quota over each three-month period is considered to have met expectations. **[1866(81:1-7); 1977(192:11-16)]** Cox understands that "salespeople have good months and bad months," and that "there are nuances in sales." That is why Cox focuses on an Account Executives' rolling three-month average (rather than on his or her sales totals for individual months) when deciding whether to utilize "performance improvement plans or anything like that." **[1867-68(82:16-83:3)]**

78. Under this system, it is possible for an Account Executive to satisfy his or her **individual monthly quota** as few as four (4) times over a twelve-month period (*i.e.*, 33% of the time) and **still** meet Cox's established performance expectations. **[*See* 1866(81:1-7)]**

79. Nevertheless, rather than abiding by the established method of evaluating an Account Executive's performance based upon his or her rolling three-month average (*i.e.*, the **only** method that Cox used to measure the sales performance of Plaintiff's co-workers **[*see* 1447-1450**

34

**& 1449-1454; 0453 (Fact No. 9)]**), Cox terminated Palzer using a new, different, and more stringent standard that measured Plaintiff's performance based upon whether he met the 80% quota for each individual month. **[***See*** 1739-1740; Fact Nos. 77 & 78, *supra*]** Specifically, in the section on Palzer's *Termination Review Form* entitled "Reason for Separation," Cox states that "[d]uring the last 29 months, Mark has only made his quota 11 months (38%)." **[1739-1740; 2035]**[9]

80.  By comparison, in 2013, African-American Brian Campbell failed to meet 80% of his individual monthly quota six (6) times, failed eight (8) times (*i.e.*, in January through May, July, September, and November) to achieve a rolling 3-month average of at least 80%, and finished the year with sales at 7.2% under the 80% performance threshold. **[1455-1456; 1955(170:5-12); 2120-2121]**

81.  Likewise, in 2014, Campbell failed to meet 80% of his individual monthly quota seven (7) times, failed nine (9) times (*i.e.*, in January,

---

[9]     Though it sounds low, Stauffer's rationale for recommending Plaintiff's termination -- that Plaintiff only made his monthly quota 11 of 29 months, or 38% of the time – is not facially indicative of performance below Cox's **established** standard.  Indeed, an employee could meet his individual monthly sales quota as few as 10 times over 29 months (*i.e.*, 34% of the time) and still achieve his rolling 3-month 80% threshold for the entire period.

March through June, and September through December) to achieve a rolling 3-month average of at least 80%, and finished the year with sales at 9.9% under the 80% performance threshold. **[1455-1456; 1955(170:5-12); 2120-2121]**

82. Unlike Plaintiff, however, Campbell was neither terminated nor placed on another Performance Improvement Plan (despite his **repeated** eligibility after **unsuccessfully** coming off a PIP at the end of April 2013). **[*See* 1562; 2120]**

83. Similarly, in 2013, 31-year-old Caucasian Andrew Finnefrock **[*see* 1562]** failed to meet 80% of his individual monthly quota eight (8) times, failed seven (7) times (*i.e.*, in March through June, August, September, and December) to achieve a rolling 3-month average of at least 80%, and finished the year with sales at 17.2% under the 80% performance threshold.

84. Despite being eligible at least twice in 2013, however, Finnefrock -- unlike Plaintiff -- was not placed on a Performance Improvement Plan, terminated, or threatened with termination. **[1457; 1955(170:5-12); 2120-2121]**

85. According to the sales performance chart produced by Cox in this case

**[2120-2121]**, the *Mark Palzer Sales History* chart (which Stauffer created to justify Palzer's termination and attached to his discharge paperwork) under-reported Plaintiff's sales ten (10) times over the 29-months depicted. **[1741]**

86.  Specifically, for 2011, Stauffer under-reported Plaintiff's sales in January (by 75%), March (by 4%), April (by 36%), June (by 23%), August (by 30%), September (by 31%), October (by 100%), and November (by 93%). Similarly, Stauffer under-reported Plaintiff's sales for November 2012 (by 20%) and May 2013 (by 1%) **[*See* 1741; 2120-2121]**

87.  Before terminating Plaintiff's employment for "poor performance," Cox did not consider Palzer's past exemplary performance, the numerous awards he had received, that his lower production numbers coincided with Stauffer's arrival **[1971(186:5-23)]** and her decision to assign Plaintiff an unsustainable module **[Fact Nos. 29 & 30, *supra*]**, that his sales territory had been reduced by 85% **[2087; 1962-63(177:23-178:4)]**, that his confinement to one module caused him to forfeit or otherwise lose hundreds of sales opportunities he had been developing **[2087; 2036]**, that he had done what was necessary to successfully complete the Performance Improvement Plans on which Stauffer had placed him

**[1970 (185:8-16)]**, that he had received nothing from Stauffer indicating that his employment was in jeopardy **[1972-73(187:3–188:2); Fact Nos. 29 & 30,** *supra***]**, and that Stauffer was not giving Plaintiff credit for sales he had conducted outside his module (although Plaintiff had obtained the prior approval of management, and Stauffer was not similarly penalizing her younger and/or African-American subordinates) **[2087;** *see also* **1521-1527; 1574; 1580; 1581; 1935-38(150:6 – 153:4); 1943(158:7-16); 1944(159:20-23);1949-50(164:11-165:5);1950-54 (165:23–169:2); 1977-78(192:17–193:15); 2007-09(222:24–224:11); 2010 (225:7); 2058]**

88. Plaintiff was the only Account Executive not on a Performance Improvement Plan when his or her employment with Cox was terminated. **[1450-1452 & 1454-1455; 2006(221:3-16)]**

## STANDARD OF REVIEW

Under Rule 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Luke v. Hospital Shared Services, Inc.*, 2013 WL 1136937 *1 (10th Cir.); *citing* FED.R.CIV.P. 56(a).

38

"Summary judgments are used sparingly in employment discrimination cases … because discrimination claims often turn on the employer's intent, and courts ordinarily consider summary judgment inappropriate to settle an issue like intent." *Jeffries v. State Kansas, Department of Social and Rehabilitation Services*, 946 F.Supp. 1556, 1561 (D.Kan.1996); *citing Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir.1994). **[*See* 1425-27 & n. 10–n. 13]**

## ARGUMENTS AND AUTHORITIES

I.  **The District Court abused its discretion in striking *Plaintiff's Response to Defendant's Motion for Summary Judgment* in its entirety.**

The abuse of discretion standard applies.

Under the abuse of discretion standard, a trial court's decision is subject to reversal if the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances. *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir.1997).  Discretion is abused "when it is exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Chase Home Finance LLC v. Gravitt*, 350 P.3d 401, 405 (Okla.Civ.App.2015); *citing Patel v. OMH Medical Ctr., Inc.*, 987 P.2d 1185, 1194 (Okla.1999).  An abuse of

discretion "is discretion employed on untenable grounds or for untenable reasons, or a discretionary act which is manifestly unreasonable." *Patel*, 987 P.2d 1194.

The District Court here abused its discretion, and committed reversible error, when it entered its *Order* **[2429-2439]** granting Cox's *Motion to Strike Plaintiff's Response to Defendant's Motion for Summary Judgment*. **[2126]** Indeed, "[s]triking is a drastic remedy that is generally disfavored." *See Francis v. Esper*, 2018 WL 2269904 (E.D.N.C.) (denying defendant's motion to strike plaintiff's response to summary judgment for having been filed out of time); *Porter v. West Side Restaurant, LLC*, 2014 WL 1642152 *2 (D.Kan.); *Evans v. Lopez*, 2000 WL 631357 *12 (N.D.Ill.) (in denying plaintiff's motion to strike defendant's belatedly-filed response to plaintiff's summary judgment motion, the court held that the response "will not be stricken" because "[l]ate filing is not grounds for such drastic sanctions"); *M&M Poultry, Inc. v. Pilgrim's Pride Corp.*, 2017 WL 11457967 *1 & n.1 (N.D.W.V.) (denying motion to strike portions of summary judgment response as too "drastic [a] remedy").

First, there was insufficient evidence here to support the District Court's conclusion that "the procedural history of this matter suggests" that

Palzer's attorney has some long-standing "pattern and practice…of disregarding the Federal Rules of Civil Procedure and the Local Civil Rules."

**[2436]** Such is not the case. [10]

---

[10]    In its *Motion to Strike*, Cox argues Plaintiff's counsel has long shown a "pattern of disregard for this Court's Local Rules, orders, and the Scheduling Order, both before and after the filing of Plaintiff's [*Response to Defendant CoxCom, LLC's Motion for Summary Judgment*]."**[2131]**    Cox bases this argument on nothing more than the following:

(a) That the magistrate judge granted Cox's motion to compel discovery and request for related Rule 37(a)(5)(A) expenses. **[2208-09, ¶¶ 4-7; 2211-12, ¶¶9-10]**

(b) That Cox filed a *Motion to Enforce* Plaintiff's counsel's payment of the fees awarded in connection with the above-referenced discovery motion.  Plaintiff's counsel, however, demonstrated that Cox filed the *Motion to Enforce* in the utmost bad faith by falsely representing to the magistrate judge that Plaintiff's attorney had "brazenly disregard[ed] the authority of the Court" **[1357]**, and that it was necessary to seek judicial intervention because Plaintiff's counsel "hid out" and "refus[ed] … to discuss" payment of the fee award." **[2228-29;** *see also* **1373-76, 2212-13, ¶¶ 13-14]** Although denying Cox's *Motion*, the magistrate judge chose not to address Cox's proven misrepresentations or the fact that Cox had filed the *Motion* in bad faith for the primary purpose of harassing Plaintiff's counsel and needlessly putting him to the time and expense of responding. **[2229-30]**

(c) That Plaintiff's summary judgment response was belatedly filed.

(d) A footnote in the summary judgment order in *Nealis v. CoxCom, LLC*, 2017 WL 1091786 *1.

Secondly, for at least two reasons, it was erroneous for the District Court to strike Plaintiff's summary judgment response in its entirety if the Court justified the same based on anything Palzer's attorney filed on behalf of a different plaintiff in an entirely separate case (*i.e.*, Case No. 16-CV-0078-CVE-TLW). **[*See* 2436, n. 5]**    The order in *Nealis* deals with conduct that Plaintiff's counsel did **<u>not</u>** repeat here.  Here, Plaintiff's counsel (a) did not file a brief "longer than twenty-five pages without leave of the Court;" (b) did not use print smaller than 12-pitch font in the body of Plaintiff's brief; (c) did not fail to include a table of contents; (d) did not fail to include a table of authorities; (e) did not fail to file Plaintiff's exhibits contemporaneously with, and as part of, Plaintiff's summary judgment response brief; (f) did not file a "corrected response" (or any supplemental pleading that materially added to Plaintiff's original summary judgment response brief); and (g) did not add to Plaintiff's original responses to Cox's "undisputed material facts." Even **if** Plaintiff's counsel had again committed these errors, however, counsel's errors in a previous, separate case still would not justify the harsh

---

Moreover, in the 19 years that Plaintiff's counsel has practiced in federal court (consisting of 79 cases in the Northern District of Oklahoma, 14 cases in the Eastern District, 9 cases in the Western District, and numerous appeals to the Tenth Circuit), no such "pattern" has been evident, nor has their been any such allegation except by Cox's attorneys in this case and the *Nealis* case.

penalty imposed on Plaintiff. *See, e.g., Doyle v. Murray*, 938 F.2d 33, 34-35 (4th Cir.1991).[11]

Third, it constituted an abuse of discretion for District Court to justify striking Plaintiff's summary judgment response based, in part, upon certain formatting errors. Although Plaintiff's counsel candidly admits that the footnotes in the summary judgment response should have been in 12-point font, his violation of the local rule was not intentional or some attempt to thumb its nose at the Court, as Cox suggested to the District Court. Rather, Plaintiff's use of 10-point font in the footnotes was inadvertent and attributable to his mistaken use of an incorrect template. The mistake is neither uncommon nor unique to Plaintiff. There have been several instances in the case below where Cox's counsel itself has made the **very same mistake** for which Plaintiff was punished by the District Court (*i.e.*, the use of 10- and 11-point font in footnotes). **[*See, e.g.*, 2301-2332]**

Neither did the mistaken use of 10-point font in the footnotes permit Plaintiff to greatly exceed the limitations of the Local Rules. Rather, after resetting the font to its regular setting at 12-point, moving the citation of

---

[11] In striking Palzer's summary judgment response brief in its entirety, including all forty-five (45) exhibits, the District Court focused largely on the late filing of just six exhibits -- Exhibit Nos. 5, 75, 79, 80, 83, and 85.

certain authorities (in pp. 32-35) to the footnotes, and re-formatting the numbering of "Plaintiff's Additional Material and/or Disputed Facts," Plaintiff's response would only exceed the 35-page limit by one-half a page. **[*See* 2291-2292 & n. 1]** Even then, courts addressing the issue have held that the appropriate remedy is to permit filing a curative brief conforming with the local rules rather than striking the brief altogether. **[*See* 2292-2293 (collecting authorities)]**

Fourth, the District Court erred in holding that Plaintiff's response violated the procedural requirements of FED.R.CIV.P. 56(c)(1) by purportedly not addressing the movant's facts with "adequate specificity." To the extent that one or more of Palzer's additional facts were referenced in response to any of Cox's numbered "facts," they addressed each such "fact" with more than adequate specificity and evidentiary support. **[*See* 1398 (¶¶16 & 17) & 1402-03 (¶¶52, 57, 59, 64 & 66), *citing* 1421-22 (¶76); 1399 (¶25), *citing* 1408 (¶¶16 & 17); 1400 (¶31), *citing* 1407-10 (¶¶13-22); 1401-02 (¶¶47-48), *citing* 1414-15 (¶¶43-50); and 1403 (¶61), *citing* 1416-16 (¶¶54-60)]**

The District Court also abused its discretion if it penalized Plaintiff for his attorney's inclusion and reference to "Additional Material and Disputed Facts" (which were all supported with pinpoint citations to the evidence).

The court found this was a "burdensome procedure" that would warrant thirteen of Cox's numbered "facts" to be deemed "undisputed." **[2493, n. 3]** Nevertheless, it is a common and well-accepted briefing practice for a non-movant to "state any additional facts that [he] contends preclude judgment as a matter of law" so long as those facts are -- as Palzer's additional facts were here -- "material to an issue raised by the movant." *See, e.g., Moore v. Jay*, 2018 WL 1145945 *2 (W.D.Okla.).

Contrary to the District Court's holding, the formatting of Plaintiff's *Response* did **not** require one to "comb through the record" aimlessly to pinpoint the evidentiary support for Plaintiff's factual assertions. **[2492-2493, n. 3]** Rather, to the maximum extent possible, the attachments to Plaintiff's *Response* were referenced with pinpoint citations. To eliminate any other unnecessary confusion, and for the court's convenience, the exhibits to Palzer's *Response* brief were also intentionally organized and numbered to correspond with the exhibit numbers used in the deposition of Cox's 30(b)(6) designee.

Cox's summary judgment exhibits, on the other hand, **are** confusing and **very** burdensome to navigate in that they re-use the same letter, are not filed as separate exhibits, fail to reference the pertinent pages of multi-page

exhibits with the necessary particularity, and  38 of the 42 exhibits are cited

**nowhere** in Cox's *Motion*.[12]   Given the District Court's decision to ignore

Cox's formatting infractions, its harsh penalization of Plaintiff for any

purported "non-compliance" with Rule 56 (which, it must be noted, also

allowed Cox to completely avoid having to respond to the numerous factual

disputes raised by Plaintiff[13])   constituted a clear error of judgment and

exceeded the bounds of permissible choice under the circumstances.

---

[12]    Cox's summary judgment brief only referred to four (4) supporting exhibits -- one 57-page deposition transcript (to which Cox's refers by page and line number) and three affidavits (to which Cox refers by paragraph number) totaling 25 pages.  To the back of the four exhibits that were actually cited in its brief, however, Cox attached an additional 38 exhibits totaling 261 pages.  However, in violation of LCvR 56.1(b) (which requires that "[t]he brief in support of a motion for summary judgment shall … contain[] a concise statement of material facts [that] shall be numbered and shall refer with particularity to those portions of the record upon which movant relies"), not one of the additional 38 exhibits is referenced anywhere in Cox's brief.  Instead, they are only referenced in the four attachments.  To make matters worse, with respect to the 90 pages of materials attached as 23 additional exhibits to the three Cox affidavits **[0711, 0748 & 0756]**, Cox only "referred to [the] multi-page exhibits as a whole, without reference to [particular] page[s]," etc.  Unlike anything in Plaintiff's summary judgment response brief, these deficiencies by Cox actually **do** lack the particularity mandated by Rule 56(c)(1)(A) and LCvR 56.1(b), require "comb[ing] through the record," and bear a **much** closer resemblance to the practices frowned upon by the trial court in other cases. *See, e.g., Murphy v. City of Tulsa*, 295 F.Supp.3d 1221, 1227-30 (N.D.Okla.2018).

[13]    Indeed, although the District Court held that Cox was entitled to recoup "all attorney fees and costs incurred by [it] in connection with

Fifth, the District Court's decision to strike Plaintiff's summary judgment response in its entirety (based on counsel's "questionable, if not bad faith" delay in filing the response **[2437]** and purported "disregard for the Federal Rules of Civil Procedure and Local Civil Rules, as well for this court and opposing counsel" **[2438]**) constituted an abuse of discretion because the District Court knew, and permitted Cox to engage in, litigation tactics that were unnecessarily burdensome, time consuming, and abusive. **[*See* 2228-2230, n. 7 - n. 9]**[14]    Mindful of the District Court's acknowledgement that "[s]triking a summary judgment response is not something th[e] court takes lightly," Cox's tactics more than counterbalanced any procedural infraction by Plaintiff and, given the totality of the circumstances, call into serious question the **fairness** of -- and

---

plaintiff's tardy and incomplete [summary judgment] response" **[2439]**, the District Court's order striking all deadlines (purportedly as a result of such tardiness) actually substantially lowered Cox's legal fees by, among other things, eliminating the expense to Cox of preparing a substantive reply brief.

[14]    The District Court also ignored the **extreme bad faith** and wastefulness practiced by Cox when it asked the Court to strike Exhibit Nos. 55, 56, 58, 64, 69, 72, and 73 to Plaintiff's summary judgment response brief based upon the claim that Plaintiff's counsel "egregiously violated" the parties' *Agreed Protective Order* by "fail[ing] to file [such documents] under seal." **[*See* 2136-2137, n. 4; 2294-2295, ¶D; 2298-2300]**

should have weighed heavily against -- the striking of Plaintiff's summary judgment response brief.[15]

Sixth, the District Court abused its discretion and committed clear error in finding that filing Palzer's summary judgment response brief nine days after the October 22nd due date (a) "resulted in prejudice to [Cox]," and (b) to such a degree "effected the judicial proceedings" **[2436 & 2438]** (*i.e.,* required an enlargement of other scheduled deadlines) that it warranted the drastic action of striking Plaintiff's response brief in its entirety and foregoing a merits-based decision[16], given:

---

[15]    To be sure, a district court has broad discretion in the administration and enforcement of its own local rules. *Puerto Rico American Ins. Co. v. Rivera-Vazquez*, 603 F.3d 125, 131 (1st Cir.2010).  Nevertheless, "this discretion is not unbridled.  **Rules must be administered evenhandedly and applied consistently**." *Id.*  "**Fundamental fairness is the mainstay of this paradigm**." *Id.*; *citing Wight v. BankAmerica Corp.,* 219 F.3d 79, 85–86 (2d Cir.2000).

[16]    In its entirety, the District Court's analysis of the first and second factors articulated in *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1253 (10th Cir. 2017), consisted of the following:

> [W]ith respect to the first and second factors, the court notes that plaintiff's delinquencies have resulted in prejudice to the defendant and effected the judicial proceedings, as the court found it necessary to strike all remaining scheduling order deadlines a month prior to the hearing on dispositive motions.

**[2438]**  The District Court cited no other "prejudice" to Cox.  "As numerous

A. The approximately four-year duration of the case (which was filed in state court in January 2015 **[0024]**, removed to federal court in October 2015 **[0017]**, appealed to this Court on February 29, 2016, remanded to District Court on December 27, 2016) **[0116-0121, 0126 & 0128]**;

B. That on four (4) previous occasions, Cox had filed for (and been granted) the entry of completely amended scheduling orders that enlarged all remaining deadlines **[0189, 0285, 0296 & 0319; *see also* 0186, 0302, 2204-2206]**;

C. That Cox repeatedly delayed the presentation of its 30(b)(6) witness for six months (until August 23, 2018) **[0347, n. 1]**;

D. That Cox specifically requested the same outcome (*i.e.,* deadlines

---

decisions make clear," however, "prejudice may not be found from delay alone." *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 784 (8th Cir.1998). *See also, e.g., Burghy v. Dayton Racquet Club, Inc.*, 695 F.Supp.2d 689 (S.D.Ohio) (holding that even though plaintiff's response to defendants' motion for summary judgment was filed one day late, and plaintiff failed to seek extension of time to file memorandum, it was appropriate to consider plaintiff's response in full because the delay was brief and caused no prejudice to defendant); *Johnson v. Graves,* 2008 WL 694730 *1 (S.D.Tex.) (permitting late response to motion for summary judgment where the only arguments defendants raised about prejudice "would have been equally applicable to a timely [r]esponse").

being stricken indefinitely) [*see, e.g.*, **2073-2074 & 2199-2200**] upon which the District Court based its holding that Cox was prejudiced [**2438**];

E. That Cox presented no evidence -- and the District Court's order identified no particular facts supporting its conclusion -- that Cox suffered **any** actual prejudice because of the nine-day delay in filing Palzer's summary judgment response brief [*see* **2126-2139**];

F. Cox candidly acknowledged that the District Court "struck the remaining deadlines included in the Fourth Amended Scheduling Order" **not** because of the Palzer's summary judgment response was filed on October 31ˢᵗ, but rather because of "the motion to strike [that Cox filed] and plaintiff's objection to the magistrate judge's denial of his motion to compel" [**2433**];

G. The relative insignificance of Plaintiff's nine-day filing delay when viewed in the overall proceedings (*e.g.,* the lapse of 321 days between filing Plaintiff's response brief on October 31, 2018 [**1390**], and the entry of summary judgment on September 17, 201 [**2490**]); and

H. That absolutely no consideration was given to the lengthy delays, proven misrepresentations to the court, frivolous filings, and other

bad faith conduct by Cox throughout the case. **[*See, e.g.*, 0347-0349 & n. 1; 2208-2213; 2228-2230, n. 7 – n. 9; 2292-2295 (¶¶ B & D); 2468-2472]**

Finally, the District Court's order striking Plaintiff's *Response* should be reversed, given the fact that alternative/lesser sanctions were both available and appropriate.  This is evident given (a) the District Court's finding that "based on the information before it, the court concludes the fault [in the 9-day filing delay] **lies squarely with plaintiff's <u>counsel</u> and therefore that is where the impact must be lodged**" **[2439]**, and (b) the fact that the Court did, in fact, impose monetary sanctions on Plaintiff's counsel for this conduct (*i.e.*, the delay in filing Plaintiff's summary judgment response). **[2523-2527]**

Since monetary sanctions were levied against Palzer's attorney for filing a "tardy and incomplete response to defendant's motion for summary judgment" **[2523 & 2439]**, and because the District Court found that such sanctions would "serve to adequately deter the undesirable behavior" **[2526]**, the District Court abused its discretion by **also** striking Palzer's *Response* in its entirety because, in so doing, it effectively imposed **another** sanction – this one on Palzer himself (because it deprived Palzer of a merits-

based decision regarding the existence of disputed facts based on all the evidence presented by the parties). *See In re Baker*, 744 F.2d 1438, 1442 (10th Cir. 1984) (courts should refrain from "effectively impos[ing a] sanction on the client" where the sanctionable conduct was the fault of the party's lawyer).[17]

"Our justice system has a strong preference for resolving cases on their merits **whenever possible**" instead of determining the outcome on technical or procedural grounds. *Lee v. Max intern., LLC,* 638 F.3d 1318, 1319 (10th Cir.2011);  *U.S. v. $96,030.00 in U.S. Currency*, 2006 WL 3813590 *3 (D.Utah); *Paul Transportation, Inc. v. Andrews*, 2014 WL 12843526 *2 (W.D.Okla.) (same); *Dillard v. Fieldcrest Cannon, Inc.,* 7 F.3d 223, 1993 WL 393339 *1 (4th Cir.1993) (reversing the district court's decision to deny the plaintiff's request to file a late response to a summary judgment motion and to grant summary judgment to the defendants, the court noted that "[g]ranting

---

[17]    In recognition of the fact that "[t]here are a broad range of sanctions available to the trial court" – the Tenth Circuit held that "[i]t is the trial court's duty, within the spirit of its total powers, … ['to administer[] and tailor[] sanctions … in a manner designed to effectuate the purpose of the sanction'].  If the fault lies with the attorneys, that is where the impact of sanction should be lodged.  If the fault lies with the clients, that is where the impact of the sanction should be lodged." *Baker*, 744 F.2d at 1442.

summary judgment when a party fails to respond to the opposing party's summary judgment motion is comparable to granting a default judgment," and that under those circumstances, the district court must consider "the availability of less drastic sanctions"). "In many cases, a lesser sanction will deter the errant party from further misconduct." *Ehrenhaus v. Reynolds*, 965 F.2d 916 (10th Cir.1992). A sanction that "defeats altogether a litigant's right to access to the courts … should be used as a weapon of last, rather than first, resort." *Id.*; *see also Pradhan v. Al-Sabah*, 299 F.Supp.2d 493,500 (D.Md.) (holding that dismissal was not appropriate sanction for failure of plaintiffs to file timely **response** within 17 days of notice to motion to dismiss, where **defendants** were not **prejudiced** by **delay** and the court had determined that plaintiffs acted in bad faith).

This Court should reverse District Court's order striking Palzer's *Response* to Cox's *Motion for Summary Judgment.*

**II.    The District Court impermissibly resolved, in movants' favor, all disputed facts and inferences relating to the issue of pretext, ignored all of Palzer's evidence that raised triable issues, and otherwise failed to adhere to the proper standards for evaluating evidence at the summary judgment stage.**

The *de novo* standard of review is applicable. *White v. York Int'l Corp.,*

45 F.3d 357, 360 (10th Cir.1995).

## A. Applicable Law

For his discriminatory discharge claims under Title VII and the ADEA[18], Palzer had to show that Cox's proffered reason for discharging Plaintiff was pretextual, and that his race and/or age was a motivating factor in the termination decision.  A "motivating factor" is a reason, alone or with other reasons, on which Cox relied when it terminated Palzer, or which moved Cox towards its decision to terminate Palzer. *Berry v. Stevinson Chevrolet*, 74 F.3d 980 (10th Cir.1996); *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir.1995); *citing James v. Sears, Roebuck & Co., Inc.*, 21 F.3d 989, 992 (10th Cir.1994).  In his *Response*, Palzer did so by producing (1) direct evidence of intentional discrimination (*i.e.*, statements indicating that Cox's termination of his employment was more than likely motivated by a discriminatory reason), and (2) indirectly by showing that Cox's reasons are unworthy of belief and are actually a cover-up for discriminatory motive. *Burdine*, 450 U.S. at 256.

---

[18]     *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 936 (10th Cir.2005) (in case arising under Title VII and the ADEA, the Tenth Circuit "analyze[s ...] age and [Title VII] discrimination claims identically").

A plaintiff can establish that an employer's "legitimate, non-discriminatory" explanation is unworthy of belief by "showing that the plaintiff was treated differently from others similarly situated," or "by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted [non-discriminatory] reasons.'" *Luster v. Vilsack*, 667 F.3d 1089, 1092-93 (10th Cir.2011); *quoting Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir.2007); *Jackson v. J.R. Simplot Co.*, 666 Fed.Appx. 739, 2016 WL 7240136 *3 (10th Cir.2016).

### B. Palzer produced evidence that Cox's "legitimate, non-discriminatory reason" for terminating his employment is unworthy of credence and constitutes evidence of pretext.

Palzer offered significant evidence establishing these categories of conduct that constitute proof of pretext by Cox:

- Cox treated Palzer less favorably than similarly-situated employees (Account Executives who dealt with Stauffer and were subject to the same standards governing performance evaluation and discipline) who were outside the protected class and who violated work rules of comparable

seriousness.[19] **[Fact Nos. 69-87]**

- The evidence, or any reasonable inferences that may be drawn therefrom, contradicts Cox's stated reason for terminating Palzer.[20]**[Fact Nos. 11, 29-30, 32, 39, 41-42, 46-49, 63-87]**

- In terminating Palzer, Cox acted contrary to its own policies.[21] **[Fact Nos. 1-11, 76-79 & 87]**

- The decisionmaker (Stauffer) did not honestly believe her stated reasons for discharging Palzer, and otherwise demonstrated that she did not act in good faith in relying upon her stated reasons.[22] **[Fact Nos. 26(e), 28-30, 42, 68-79, 85-87]**

- Cox's purported basis for terminating Palzer was <u>not</u> thoroughly examined, and the decisionmakers misrepresented and/or willfully

---

[19]    *Johnson v. Outback Steakhouse of Florida, Inc.*, 328 F.Supp.2d 1115, 1121 (D.Kan.2004); *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000); *Grisham v. Frito-Lay, Inc.*, 1981 WL 184 *4 (D.Kan.).

[20]    *See Toth v. Gates Rubber Co.*, 216 F.3d 1088, 2000 WL 796068 *7 (10th Cir.); *Shaw v. Klinkhamer*, 2005 WL 1651179 *4 (N.D.Ill.).

[21]    *See also Jackson v. J.R. Simplot Co.*, --- Fed.Appx. ---, 2016 WL 7240136 *3 (10th Cir.) (recognizing that "a failure to follow company policy can support a finding of pretext"); *citing E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir.2011).

[22]    *Proctor v. U.P.S.*, 502 F.3d 1200, 1211 (10th Cir.2007).

exaggerated the facts they claimed supported their discharge recommendation.[23] **[Fact Nos. 26(e), 28-30, 42, 47-49, 59-60, 63-64, 68-79, 85-87]**

- Although it received multiple complaints of discrimination, Cox conducted no investigation, and undertook no kind of appropriate response.[24] **[Fact Nos. 1-7, 40, 43-49, 53-60 & 87]**

- The testimony of the individual(s) at Cox who decided to terminate Palzer (Stauffer and Cruts) is inconsistent, or is otherwise unconvincing.[25] **[Fact**

---

[23]     *Adams v. Denver Health & Hospital Authority*, 2016 WL 1247732 (D.Colo.) (employer's failure to fully investigate or consider the circumstances before terminating plaintiff constituted evidence of pretext); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218-20 (10th Cir.2002); *see also Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1422-23 & n. 4 (7th Cir.1992) (finding that employer's termination of plaintiff for low sales figures without ever looking into or accounting for the possible effect of territory changes constituted evidence of pretext).

[24]     *Sassaman v. Gamache*, 566 F.3d 307 (2nd Cir.2009) (holding that an employer's inadequate response to an allegation of discrimination may itself constitute evidence of discrimination); *Hooks v. Lockheed Martin Skunk Works*, 114 Fed.Appx. 769 (9th Cir.2001) (a sham investigation can be evidence of a company's lack of good faith efforts to comply with anti-discrimination laws); *Estate of Bassatt v. School Dist. No. 1 in the City and County of Denver*, 775 F.3d 1233, 1240 (10th Cir.2014).

[25]     *Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1422 (7th Cir.1992); *Dominguez v. Suttle Caribe*, 202 F.3d 424, 432-433 (1st Cir.2000).

**Nos. 29, 30, 52, 64, 65, 68, 71-73, 75, 76, 85 & 86]**

- Cox management has been untruthful in one area of the case, which would permit a jury to reasonably infer that Cox has also been untruthful regarding its "legitimate, non-discriminatory reason" for terminating Palzer's employment.[26] **[Fact Nos. 9, 15-18, 27-30, 45-52, 61-62, 65, 67-68, 76 & 85-86]**

- Cox engaged in practice or pattern of behavior evidencing discriminatory animus towards the protected classes to which Palzer belongs.[27] **[Fact Nos. 31-42 & 45-47]**

- Cox made negative race- or age-based comments constituting

---

[26]     *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446 (7th Cir.1994); and *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 732-33 (4th Cir.1996)(recognizing that "the plaintiff's evidence undermining some of the defendant's asserted reasons might lead a jury to believe that the remaining reasons also are pretextual").

[27]     *Mendelsohn v. Sprint/United Mgmt. Co.,* 466 F.3d 1223, 1226-27 (10th Cir.2006); *citing Greene v. Safeway Stores, Inc.*, 9 F.3d 554, 560-61 (10th Cir.1996) (employer's termination of other older employees was relevant as evidence of age-based discriminatory animus in individual ADEA case); *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 776 (10th Cir.1999) (testimony of other employees regarding how defendant treated them was relevant to employer's discriminatory intent where "testimony establishes a pattern of retaliatory behavior or tends to discredit the employer's assertion of legitimate motive").

circumstantial evidence that its discharge of Palzer was motivated by discriminatory animus.[28] **[Fact Nos. 32, 34, 37-39 & 47-49]**

- Cox made false representations in its position statement to the EEOC that were purposeful and/or that it failed to correct.[29] **[Fact Nos. 12, 16-17, 19-20, 61 & 62]**

- Palzer receives a suspiciously negative performance evaluation in close temporal proximity to the occurrence a legally significant event.[30] **[Fact**

---

[28]    *Avila v. Jostens, Inc.*, 316 Fed.Appx. 826, 833 (10th Cir.2009); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151-52 (2000)[28]; *Alfonso v. SCC Pueblo Belmont Operating Co., LLC*, 912 F.Supp.2d 1018, 1028-29 (D.Colo.2012); *see also Priddy v. Federal Express Corp.*, 2006 WL 8435828 (W.D.Tenn.) (direct evidence of "reverse" race discrimination included supervisor's repeated remarks that "there are too many white male managers here"); *Zosimo v. Delvalle*, 22 F.Supp.2d 42 (E.D.N.Y.1998)[28]; *EEOC v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir.1990) (decisionmaker's remark that "if it were [his] company, [he] would **hire** no black people," constituted direct evidence of employer's discriminatory failure to promote; court held that there was no reason to think that decisionmaker's discriminatory attitude differed from hiring to promotion).

[29]    *Fairbrother v. Orkin Exterminating Co., Inc.*, 2003 WL 192480 *10 (D.Kan.); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 238 (5th Cir.2015) (holding that "[a] jury may view erroneous statements in an EEOC position statement as circumstantial evidence of discrimination").

[30]    *Giacoletto v. Amax Zinc Co., Inc.*, 954 F.2d 424 (7th Cir.1992) (plaintiff's receipt of suspiciously negative performance evaluation six days before he was fired, despite the productivity of the department he managed, constituted evidence of pretext).

Nos.  40, 42, 72 & 73]

- Cox imposed unattainable production goals or subjective standards.[31]

[Fact Nos. 13-15, 19, 21, 26(e), 29, 30, 87]

When evaluating Palzer's evidence of pretext, the District Court failed to view such evidence (along with any reasonable inferences to be drawn therefrom) in its **totality**. *Beaird v. Seagate Tech, Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998).  While the Court might have considered a particular item of

---

[31]     *Willnerd v. First Nat. Nebraska, Inc.*, 555 F.3d 770 (8th Cir.2009) (imposition of unattainable production goal constituted evidence of pretext since jury may reasonably view the production quota as an effort to set up an employee for failure); *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 499 (8th Cir.1998) (same); *Burrus v. United Tele. Co. of Kansas, Inc.*, 683 F.2d 339, 342 (10th Cir.1982) (subjective employment criteria may provide opportunities for unlawful discrimination).  *See also, Coco v. Elmwood Care, Inc.*, 128 F.3d 1177 (7th Cir.1997) (firing an employee for failing to meet expectations that the employer never actually had is firing for a phony reason); *Kresnak v. City of Muskegon Heights,* 956 F.Supp. 1327, 1338 (W.D.Mich.1997) (the very requirements that prevented plaintiffs from being qualified for job were themselves imposed with a discriminatory animus); *Christie v. Foremost Ins. Co.*, 785 F.2d 584, 586-87 (7th Cir.1986) (finder of fact could reasonably conclude that employer's reliance on subjective judgment about plaintiff's capabilities, even though plaintiff was objectively superior to employee who was not fired, constituted evidence of pretext); *Bell v. Bolger*, 708 F.2d 1312, 1319-20 (8th Cir. 1983) (holding that subjective procedures "are to be closely scrutinized because of their susceptibility to discriminatory abuse").

*See also Messick v. Horizon Industries, Inc.*, 62 F.3d 1227 (9th Cir.1995); *McCullough v. Xerox Corp.*, 2015 WL 5769620 *4 (N.D.Cal.). **[***See* **1432, n. 18 for summary of holdings]**

evidence, when viewed in isolation, to be insufficient to support a jury verdict, the Court should have not made its decision based on anything less than the **cumulative** significance of Palzer's pretext evidence. *See id.*

Applying that standard, and under the legal authorities set forth hereinabove, Palzer clearly offered evidence that was more than sufficient to present a triable issue on whether Cox's "legitimate, non-discriminatory reason" for terminating Palzer is unworthy of credence and constitutes evidence of pretext. This Court should reverse the order denying Cox's *Motion for Summary Judgment* regarding the discriminatory discharge claims brought by Palzer under Title VII and the ADEA, and remand the matter to District Court for trial on those claims.

### C. The District Court committed reversible error in holding that "Campbell, Crawford, Finnefrock, and Young were not similarly situated" to Palzer.

"The Tenth Circuit has recognized that a plaintiff may show pretext on a theory of disparate treatment by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness. An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and

discipline." *Johnson v. Outback Steakhouse of Florida, Inc.*, 328 F.Supp.2d 1115, 1121 (D.Kan.2004); *citing Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000); *Grisham v. Frito-Lay, Inc.*, 1981 WL 184 *4 (D.Kan.). *See also Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir.2008) (on review of ADEA claim, appellate court held that "[t]he district court's framing of the similarly-situated standard [wa]s too narrow and necessitate[d] an exact correlation not required by the law"); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th Cir.2007) (prescribing flexible, "common sense approach" to "similarly situated" evaluation and emphasizing that point is to determine existence of enough common features to allow "meaningful comparison")

Here, the District Court determined that "Campbell, Crawford, Finnefrock, and Young were not similarly situated to plaintiff" and "do not have similar work histories to plaintiff" because they "did not begin employment with Cox until 2012" and "were subject to a 'ramp period' for the first four months of their employment," whereas Palzer had worked as an Account Executive since 2008. **[2510-11]** The Court's determination is flawed in several respects.

First, the Court ignores the fact between  mid- to late-2012, all four of the above-named individuals became subject to the same sales quota attainment requirement as Palzer.  Specifically, as of October 2012, Campbell and Young could no longer take advantage of the "ramp period."  Likewise, Crawford and Finnefrock had completed their four-month "ramp periods" by the end of July 2012 and December 2012, respectively.  By the end of 2012, Campbell, Crawford, Finnefrock, and Young all "deal[t] with the same supervisor," Shelley Stauffer, "and [were] subject to the same standards governing performance evaluation and discipline" as Palzer.  But in analyzing Palzer's age discrimination claim, the District Court inexplicably sidestepped whether these individuals were similarly situated with Palzer in 2013, and ignored Palzer's evidence of disparate treatment occurring following 2012. **[*See* Fact Nos. 80-84]**

Second, except for the four months during which new employees were subject to a "ramp period" that relaxed their quota requirements, any differences among individuals regarding the length of time they worked as Account Executives are immaterial to the "similarly situated" analysis. Framing the concept so narrowly (as the District Court did here) improperly

63

bars a plaintiff from ever establishing that he was similarly situated with anyone who was not hired at approximately the same as he was

Thirdly, the District Court overlooks the significant fact that Cox itself regularly compared the Account Executives under Stauffer's supervision with one another, holding them to the same standards, and generating rankings at least once every month.

It constituted reversible error for the District Court to summarily disregard the evidence produced by Palzer demonstrating that he was treated less favorably than similarly-situated employees (Account Executives who dealt with Stauffer and were subject to the same standards governing performance evaluation and discipline) who were outside the protected class and who violated work rules of comparable seriousness. **[Fact Nos. 69-87]**

### D.  The District Court erred in holding that Stauffer's membership in the protected class was dispositive of pretext.

The District Court also erred in granting summary judgment based upon the fact that "the individual who made the recommendation to discharge plaintiff … was also a member of the protected class at the time of the employment decision."  Specifically, the District Court held, "The fact that critical employees in the discharge decision were members of the same

protected class **belies <u>any</u> suggestion of pretext**." **[2511]**  The cases cited by

the District Court, however, do **not** stand for the proposition that a

decisionmaker's membership in the protected class conclusively rules out

pretext.  Rather, the case law holds that while a decisionmaker's membership

in the protected class may make it more difficult for a plaintiff to prove

discriminatory motive, the burden is **not** insurmountable. *See Elrod v. Sears,*

*Roebuck and Co.*, 939 F.2d 1466 (11th Cir.1991) (holding that the plaintiff in an

ADEA action "face[d] a **difficult** burden" -- but not an impossible one --

where "all of the primary players behind his termination … were well over

age forty," and that a plaintiff is capable of "carry[ing] this burden" with

evidence sufficiently probative of discriminatory intent).

Palzer has offered probative evidence sufficient to clear the above-

referenced hurdle.  Although Stauffer was admittedly a member of the

protected class, she was also  **repeatedly** heard to say there were "too many

old, white men" employed at Cox, that her sales team was too "white male

heavy," that she would not consider hiring white applicants, and that she

intended to hire only people of color.  These statements were more than

sufficient to create a genuine dispute on discriminatory motive.

**III.** **The District Court erred in denying Palzer's** *Objection to Magistrate Judge's October 3rd Order Denying Motion to Compel Compliance with Fed.R.Civ.P. 30(b)(6).*

*See* arguments and authorities in 0347-0440 and 1342-1354, which

Palzer incorporates by reference.

## STATEMENT CONCERNING ORAL ARGUMENT

Appellant does not request oral argument.

**Respectfully submitted,**

/s/ Christopher L. Camp
**Christopher Lincoln Camp, OBA #18541**
**CAMP LAW FIRM**
**7122 South Sheridan Road, Suite #2-382**
**Tulsa, Oklahoma  74133**
**Telephone: (918) 200-4871**
**E-mail: camplawfirm@gmail.com**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   ■ this document contains <u>12972</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   ☐ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ■ this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word (Version  16.15)</u> in <u>14-point</u> font size of the <u>Book Antiqua</u> type style, or

   ☐ this document has been prepared in a monospaced typeface using _____ with _____ characters per inch in the _____ type style.

**Date:** <u>January 27, 2020</u>           <u>/s/ Christopher L. Camp</u>
                                **Christopher L. Camp, OBA #18541**
                                **Camp Law Firm**
                                **7122 South Sheridan Road, Suite #2-382**
                                **Tulsa, Oklahoma  74133**
                                **Telephone: (918) 200-4871**
                                **E-mail: camplawfirm@gmail.com**

                                **Attorney for Appellant Mark Palzer**

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)     all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)     if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)     the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Sophos Anti-Virus for Mac OS X (Version 9.9.6 – Updated November 2019), and according to the program are free of viruses.


/s/ Christopher L. Camp
**Christopher L. Camp, OBA #18541**

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher L. Camp, hereby certify that on January 27, 2020, I electronically transmitted the foregoing *Appellant's Opening Brief* to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

William W. O'Connor, Esq.
Keith Wilkes, Esq.
Margo Shipley, Esq.
William Deveney, Esq.

/s/ Christopher L. Camp
**Christopher L. Camp, OBA #18541**

# **Attachment 1**

# *Order*

[granting *Motion for Summary Judgment*]

**September 17, 2019**
**Dkt. #171**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

MARK ANTHONY PALZER,         )
          )
       Plaintiff,      )
          )
v.               )     Case No. 15-CV-00564-GKF-JFJ
          )
COXCOM, LLC d/b/a COX     )
COMMUNICATIONS TULSA,    )
          )
       Defendant.     )

## ORDER

This matter comes before the court on the Motion for Summary Judgment [Doc. 114] of defendant CoxCom, LLC d/b/a Cox Communications Tulsa ("Cox"). For the reasons discussed below, the motion is granted.

### I.    Background/Procedural History

This is an employment discrimination case. Plaintiff asserts claims for discrimination based on age and retaliatory discharge in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*.; discrimination based on race and retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*; and breach of contract.[1]

Defendant filed the instant motion seeking summary judgment in its favor as to all of plaintiff's claims. As more fully set forth in the court's Order on Cox's Motion to Strike Plaintiff's Response to Defendant's Motion for Summary Judgment, dated May 1, 2019, plaintiff failed to

---

[1] Plaintiff's Petition for Wrongful Termination and Discrimination in Employment also asserted claims under the Oklahoma Anti-Discrimination Act ("OADA"), 25 Okla. Stat. §§ 1101 *et seq*. In its Opinion and Order dated July 3, 2018, this court dismissed plaintiff's OADA claims. *See* [Doc. 102].

timely respond to Cox's motion.  *See* [Doc. 165, at pp. 1-6].  Further, although plaintiff filed a response to the motion on October 31, 2018, the response was deficient in that it did not attach all the referenced exhibits and the brief's footnotes were smaller than the twelve-point font required by Local Civil Rule 7.2(c).  [*Id.*].  Then, on November 9, 2018, plaintiff, without seeking leave of the court, filed two documents:  the first, titled "Errata/Correction to Pages 3, 14, 15 & 33 of Plaintiff Mark Palzer's Response to Defendant CoxCom LLC's Motion for Summary Judgment" and the second, "Exhibit Nos. 14, 75, 79, 80, 83, & 85 Supporting Plaintiff Mark Palzer's Response to Defendant CoxCom, LLC's Motion for Summary Judgment."  [Doc. 139 and Doc. 140].

Defendant filed a motion to strike plaintiff's response.  [Doc. 141].  Plaintiff did not timely respond to the motion to strike.[2]  Pursuant to its May 1, 2019 order, the court granted defendant's motion to strike and directed the Court Clerk to strike and publicly seal from view plaintiff's response to defendant's motion for summary judgment [Doc. 135], Errata/Correction [Doc. 139], and supplement attaching exhibit nos. 14, 7, 79, 80, 83, and 85 [Doc. 140].  *See* [Doc. 165].  However, in so doing, the court emphasized that its ruling was independent of its determination of defendant's motion for summary judgment.  [Doc. 165, p. 10].  Thus, based on the court's procedural orders, defendant's motion for summary judgment is now ripe for the court's review.

## II.    Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

---

[2] As more fully set forth in the court's May 1, 2019 order, plaintiff filed an untimely response on December 17, 2018, despite this court having previously denied plaintiff's second request for an extension of the deadline.  [Doc. 161].  The court struck plaintiff's untimely response.  [Doc. 162].

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995). The inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

With respect to the determination of a motion for summary judgment when the nonmoving party fails to respond, the Tenth Circuit has stated as follows:

> a party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party. The district court must make the additional determination that judgment for the moving party is "appropriate" under Rule 56. Summary judgment is appropriate only if the moving party demonstrates that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. By failing to file a response within the time specified by the local rule, the nonmoving party waives the right to respond or to controvert the facts asserted in the summary judgment motion. The court should accept as true all material facts asserted and properly supported in the summary judgment motion. But only if those facts entitle the moving party to judgment as a matter of law should the court grant summary judgment.

*Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).

## III.   Undisputed Material Facts

The following facts are undisputed for summary judgment purposes.[3] Plaintiff Mark Palzer, a Caucasian male, was born in May of 1962. In September 2005, Palzer began employment

---

[3] As previously stated, the court struck plaintiff's response to the defendant's motion for summary judgment and therefore the court accepts as true all material facts asserted and properly supported by defendant's motion for summary judgment. However, the court notes that, in the stricken response, plaintiff admitted for purposes of summary judgment defendant's undisputed material fact nos. 1-6, 8-15, 18-22, 27, 33-43, 45, 49-50, 53-54, 58, 60, 62-63, 65, 67-68, and 70-74. [Doc. 135, p. 9]. Further, the factual portion of the stricken response includes two parts: a twenty-six

with Cox as an Account Services Representative, and, in March 2008, Palzer moved to an Outside

Sales Representative, or "Account Executive" position, on the Cox Business Inside Sales Team in

March of 2008.  The principal duty of a Cox Business Account Executive was to sell, re-sell, or

up-sell telephone data and/or video products to new or existing commercial business customers.

---

paragraph part entitled "Plaintiff's Response to Defendant's 'Undisputed Material Facts'" and an eighty-eight paragraph part entitled "Plaintiff's Additional Material and/or Disputed Facts."  In the "Plaintiff's Response to Defendant's 'Undisputed Material Facts'" part, plaintiff cites only his own "additional" material facts to dispute defendant's fact nos. 16, 17, 25, 31, 47, 48, 52, 57, 59, 61, 64, 66, and 69].  The "additional facts," in turn, cite exhibits and portions of the record.  Pursuant to Local Civil Rule 56.1(c):

> The response brief in opposition to a motion for summary judgment (or partial summary judgment) shall begin with a section which contains a concise statement of material facts to which the party asserts genuine issues of fact exist.  **Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies and, if applicable, shall state the number of the movant's facts that is disputed.**  All material facts set forth in the statement of the material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party.

LCvR 56.1(c) (emphasis added).  The local rule is consistent with statements of the Tenth Circuit interpreting FED. R. CIV. P. 56, and meant to further the purposes of Rule 56.  This court "is not required to comb through Plaintiff[']s evidence to determine the bases for a claim that a factual dispute exists."  *Bootenhoff v. Hormel Foods Corp.*, No. CIV-11-1368-D, 2014 WL 3810329, at *2 n.3 (W.D. Okla. Aug. 1, 2014) (citing *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1199 (10th Cir. 2000)).  Plaintiff's practice of referring to only his own statements of additional undisputed material facts requires the court to first find the referenced statements of undisputed material fact in a separate section of the response, look to the exhibits referenced therein, and comb through the record to find the relevant material.  This burdensome procedure does not satisfy the particularity requirement of LCvR 56.1(c).  Because plaintiff failed to properly address defendant's fact nos. 16, 17, 25, 31, 47, 48, 52, 57, 59, 61, 64, 66, and 69, and, had the court not stricken the response brief entirely, the court would have considered those facts undisputed for purposes of Cox's motion for summary judgment. *See Espinoza v. Coca-Cola Enters., Inc.,* 167 F. App'x 743, 746 (10th Cir. 2006) ("[W]here the nonmovant failed to support his case with adequate specificity, we will not fault the court for not searching the record on its own to make his case for him (nor will we take on that role of advocacy).")); *see also Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 672 (10th Cir. 1998) (noting the "special importance" of the requirement that the nonmovant specifically reference facts in its motion materials and the record in employment discrimination cases).

Account Executives are subject to a Sale Compensation Plan, which provides that "[p]articipation in this plan is not a guarantee of employment for a specified period of time, and the company reserves the right to dismiss or discharge any participant at any time for any lawful reason."

Once an Account Executive completes his or her training, the executive's performance is generally measured against two benchmarks:  (1) sold quota attainment, referred to as "closed won," which is measured by the dollar amount of contracts signed by the then-potential Cox customer; and (2) installed quota attainment, referred to as "closed installed," which is measured by the actual dollar amount of services ultimately installed and billed to the customer.  [Doc. 114-4, pp. 2-3, ¶¶ 5-6].  Account executives are expected to meet one hundred percent (100%) of their monthly sales quotas, but their performance is regularly evaluated using a rolling three-month average, which is expected to be maintained at a minimum of eighty percent (80%) to quota attainment.  On May 25, 2010, Palzer's then-manager issued Palzer a documented verbal warning and thirty (30) day performance improvement plan ("PIP") because his installed attainment to quota over the prior four months was fifty-one percent (51%).

Cox's then-Business Sales Director Tim Jenney, a Caucasian born in 1974 who was then 37 years old, hired Shelley Stauffer as the new Small-Medium Business Team Manager effective February 4, 2012.  Stauffer is a Caucasian female born in 1960, and was 51 years old at the time of her hire.  Existing members of the Small-Medium Business Team on the date of Stauffer's hire were Palzer, who was then 49 years old; Larry Scroggins, a Caucasian male born in 1967 who was then 44 years old; Edward (Hunter) Harris, a Caucasian male born in 1983, who was then 28 years old; and Chuck Watson, a Caucasian male born in 1982, who was then 29 years old.

In 2011, each of the Account Executives on the Small-Medium Business Team had monthly sales quota of $1,700.  In 2012, the monthly sales quota was increased to $1,800.  Palzer

failed to meet his monthly sales quota in December 2011, as well as January and February of 2012, leaving his three-month average sold quota attainment below 80%.[4]  [Doc. 114-4, p. 3, ¶ 10; Doc. 114-2, pp. 10-11].  During that same period, Harris and Scroggins had three-month averages of 52% and 39%, respectively.  On March 9, 2012, Stauffer placed both Palzer and Scroggins on a ninety (90) day PIP to run through May 2012, and placed Harris on a thirty (30) day PIP through the end of March 2012.  Watson had a rolling three-month average from December 2011 to February 2012 of 110% sold quota attainment, and was not placed on a PIP.

In February 2012, at Jenney's direction, Stauffer began developing a module sales territory strategy for the Small-Medium Business Sales team.  Pursuant to the strategy, Account Executives on the team would prospect for and cultivate customers in assigned zip codes.  Prior to implementation of the module sales territory strategy, Account Executives could sell in any zip code within the Tulsa marketplace.  On February 29, 2012, Stauffer informed her team of the transition to the new module strategy, and requested that the Account Executives provide any specific zip code preferences for her to consider when making the module zip code assignments. In their preferences, both Palzer and Watson identified the 74012 zip code.

The final module and zip code assignment plan consisted of seven individual modules, five of which were assigned to specific team members:  Harris, Scroggins, Watson, Palzer, and Stacy Crawford, an African-American female, born in 1974 who was then 37 years old.  Stauffer hired

---

[4] In the stricken response, Palzer disputes his monthly sold quota attainment in December of 2011. [Doc. 135, p. 9, ¶ 16].  Palzer points to a January 8, 2013 letter from Stauffer to Palzer wherein his sales quota for December 2011 is stated as being 57%.  *See* [Doc. 135-32, p. 1].  However, both Cox and Palzer offer evidence that his sales quota attainment in January 2012 was 35% and in February 2012 it was 47%.  *See* [Doc. 114-2, pp. 10-11 and Doc. 140-5, p. 8].  Therefore, regardless of whether his sold quota attainment was 31% or 57% in December 2011, Palzer failed to meet his monthly sold quota in December 2011, and his three-month average sold quota attainment was also below 80%.

Crawford for a newly authorized Account Executive position effective March 26, 2012.  Each of the seven modules had a projected annual value of at least $4,000,000.00.  [Doc. 114-4, pp. 5-6, ¶ 17; p. 48].  Stauffer assigned the 74012 zip code to Watson.  Jenney reviewed and approved the final proposed modules and zip codes for each account executive.

On March 5, 2012, Stauffer sent an email to her team announcing the assigned modules and zip codes.  In the email, Stauffer asserted that she used the following methodology to assign the zip codes:  "[r]equests first"; "[o]rder in which [she had] received the requests"; "[t]ie breakers based on performance"; and "[e]quality among all team members – balancing total weighted value with the number of zip codes assigned."  [Doc. 114-4, p. 51].  The sales module territory strategy was scheduled to take effect on May 15, 2012, but ultimately did not take effect until May 31, 2015.  Until the effective date of the sales module territory strategy, Account Executives could continue to sell in any zip code, but were supposed to be developing their assigned zip codes.

Palzer exceeded his monthly quota attainment during March and April of 2012, and sold 87% to quota attainment during May 2012, completing his PIP with a rolling three-month average of 117%.  Scroggins also completed his PIP with a rolling three-month average of 85% to sold quota attainment.  However, Harris sold only 64.6% to quota attainment during April 2012, 22.5% to quota attainment during May 2012, and 11.7% to quota attainment in June 2012, and was discharged.

Effective May 26, 2012, Stauffer hired Brian Campbell, a then-26 year old African American male who was born in 1986, for a newly authorized Account Executive position. Additionally, effective May 29, 2012, Stauffer hired Jakobe Young, a then-36 year old African American male born in 1976, for another newly authorized Account Executive position.  Effective August 20, 2012, Stauffer hired Jeannette Barr, a then 43 year old Caucasian female born in 1969,

to fill Harris's former position.  The account executives hired in 2012 also had a sold and installed quota attainment of $1,800 per month but were subject to a "ramp" period as follows:  0% to quota during the first full month of their hire while in training; 25% during the second month of their employment; 50% during the third month; 75% during the fourth month; and 100% during the fifth month of their employment.

In the three months following implementation of the sales module strategy, Palzer sold 72% to quota attainment in June 2012; 100% to quota attainment in July 2012; and 71% to quota attainment in August 2012, for a rolling three-month average of 81% to sold quota attainment.[5] [Doc. 114-2, pp. 10-11].  During that same period, Scroggins achieved a rolling three-month average of 100% sold to quota attainment and Watson obtained a rolling three-month average of 113% sold to quota attainment.  On August 9, 2012, Watson left the Small-Medium Sales Team for an Account Executive position with Cox Business's Mid-Market Sales Team.  [Doc. 114-2, p.

---

[5] In the stricken response, plaintiff does not dispute his sold quota attainment in June or July 2012, but contends that his sold quota attainment in August 2012 was 102%.  [Doc. 135, pp. 32-33, ¶ 76].  As in initial matter, the court notes that, to dispute defendant's material fact no. 52, plaintiff improperly refers only to his own statement of additional material facts and therefore, had the court considered plaintiff's response brief, the court would have deemed defendant's undisputed material fact no. 52 undisputed.  *See supra* n.3.  Further, in plaintiff's additional fact purporting to dispute his August 2012 sales quota attainment, plaintiff points to undated correspondence related to the Rusty Crane account wherein plaintiff concedes that the account was not within one of his assigned zip codes [Doc. 135-18]; twenty-seven pages of account notes with no explanation beyond handwritten notes suggesting that other team members sold in Palzer's zip code in May and July 2012 (rather than August) without permission [Doc. 135-19, pp. 3, 15-16, and 25-27]; a January 8, 2013 PIP extension from Stauffer to Palzer reflecting a sold quota attainment in August of 71% [Doc. 135-32]; and his own affidavit averring "my sales in August 2012 were $1,841, $568 more than Cox is claiming."  [Doc. 140-2, p. 11, ¶ 30].  Plaintiff offered no evidence relative to his own permission to sell outside of his zip code or that other team members lacked permission to sell inside his zip code.  Further, plaintiff offers no evidence beyond his own conclusory statements that all accounts attributable to him were not included in his August 2012 sold quota attainment.  Absent evidence that the referenced accounts were properly attributable to Palzer, his self-serving affidavit is insufficient to create a genuine dispute of fact regarding plaintiff's August 2012 sold quota attainment.

4, ¶ 11; Doc. 114-4, pp. 9-10, ¶ 42].   On August 18, 2012, Stauffer hired Andrew Finnefrock, a then-29 year old Caucasian male.  [Doc. 114-2, p. 5, ¶ 16].

Palzer sold 49% to quota attainment in September 2012 and 22% to quota attainment in October 2012, thereby placing his three-month rolling quota attainment average below 80%.[6] [Doc. 114-2, pp. 10-11].   On October 24, 2012, Stauffer placed Palzer on a sixty-day PIP to run through December 2012.  The PIP noted that Palzer "ha[d] only made quota 4 of 9 months."  [Doc. 114-1, p. 225].   Palzer's November sold to quota attainment was 106%, and his sold to quota attainment for December was 90%.  [Doc. 114-2, p. 11].

On or about December 21, 2012, Palzer, while represented by his then-legal counsel Jeff Nix, submitted an intake questionnaire to the Equal Employment Opportunity Commission ("EEOC") for the period from February 2, 2012 to December 20, 2012, alleging that he was being discriminated against because of his age, race, and sex.  The intake questionnaire was assigned EEOC charge number 564-2013-0034, and, on December 27, 2012, the EEOC sent Cox a Notice

---

[6] In the stricken response, plaintiff contends his October sold to quota attainment was 75%.  *See* [Doc. 135, pp. 32-33, ¶ 76].  Again, the court notes that, to dispute defendant's material fact no. 57, plaintiff improperly refers only to his own statement of additional material facts and therefore, had the court considered the response brief, the court would have deemed defendant's material fact no. 57 as undisputed.  Further, in his additional material fact purporting to dispute his October 2012 sold quota attainment, plaintiff cites his own affidavit, wherein he avers that his October 2012 sales did not include sales totaling $962 from the following accounts:  Vincent Anthony Jewelers, Little Caesers Pizza, and Oasis Network.  However, plaintiff offers no evidence beyond his own affidavit that the accounts were not included.  Nor does plaintiff offer evidence of the sales value for the Little Caesers Pizza or Oasis Network accounts.  Thus, the evidence offered by plaintiff does not create a genuine dispute of material fact as to his October 2012 sold to quota attainment.  Palzer also cites a January 8, 2013 PIP extension, which also states that plaintiff's October 2012 sold to quota attainment was 22%, and therefore the January 8, 2013 PIP extension does not create a genuine dispute of material fact.  Moreover, even if Palzer's October sold to quota attainment was 75%, as claimed by plaintiff, his three-month rolling sold to quota average still falls below 80%.  This is true even if it is assumed that plaintiff obtained a 102% sold to quota average in August of 2012 as asserted by plaintiff.  *See* [Doc. 135, pp. 33 (2012 3-Month Rolling Average for October)].

of Charge of Discrimination informing Cox as follows: "The Commission has received an unperfected charge. The Commission is working to perfect the writing of this charge. Upon completion, as regulations allow, we will mail you a copy of the charge." On January 29, 2013, however, the EEOC informed Cox "that the charge cited above has been withdrawn due to Charging Party's failure to respond to communications from the Commission," and that the EEOC was "terminat[ing] any further processing of this matter."

In 2013, each of the Account Executives on the Small-Medium Business Team, including Palzer, had monthly sales quotas of $1,900. On January 8, 2013, Stauffer placed Palzer on a 30-day PIP extension. The January 8, 2013 PIP extension requests that Palzer note:

- In the past three months your cumulative installed quota attainment is 27%.
- In the past three months your cumulative sold quota attainment is 66%.

[Doc. 114-1, p. 227]. Palzer completed his PIP in January 2013, selling $2,451 and thereby exceeding his monthly sold attainment quota of $1,900. However, over the next four months, Palzer sold 42% to quota in February 2013, 29% to quota in March 2013, 47% to quota in April 2013, and 46% to quota in May 2013. On June 6, 2013, Melissa Cruts, Cox Human Resources Manager for the Tulsa, Oklahoma City, and Northwest Arkansas markets, sent an email and Termination Review Form regarding Palzer to Randy Chandler, Vice President of Cox Business; Keith Means, Manager of the Cox Business Large Sales team; and Heather Romeike, Oklahoma Human Resources Director. Chandler is a Caucasian male, born in 1956, who was then 56 years old. [Doc. 114-2, p. 3, ¶ 5]. Means is a Caucasian male, born in 1958, and was then 55 years old. [*Id.* ¶ 5]. Romeike is a Caucasian female born in 1972, who was then 41 years old. [*Id.* ¶ 20]. The Termination Review Form stated as follows:

> [Plaintiff] has continually failed to meet his sales quota. During the last 29 months, [plaintiff] has only made his quota 11 months (38%). He has been on multiple Performance Improvement Plans within the last year. The expectation was

communicated verbally and in the PIP's that [plaintiff] must make and sustain improved performance. However, [plaintiff] fails to sustain any improvement in his performance.

[Doc. 114-2, p. 26]. Palzer's termination was approved by Means, Chandler, Romeike, and Becky Ordoyne, Romeike's Director, a then 53 year old Caucasian female. Palzer was discharged on June 10, 2013.

On March 14, 2014, Palzer filed a second EEOC Intake Questionnaire, which was assigned EEOC charge number 564-2014-00643, alleging that he was discriminated against because of his age, race, and sex, and in retaliation for alleged protected activity under the ADEA and Title VII. On June 13, 2014, Palzer filed a perfected EEOC charge number 564-2014-00643, purporting to cover the period from February 2, 2012 to June 10, 2013. On October 22, 2014, the EEOC dismissed charge number 564-2014-00643 and issued plaintiff a notice of right to sue on that charge number, pursuant to which Palzer brought this action in state court on January 20, 2015.[7] Cox was not served until September 14, 2015 [Doc. 2-2], and this action was removed on October 2, 2015.

## IV.   Analysis

Defendant seeks summary judgment based on five separate "propositions": (1) plaintiff's ADEA and Title VII claims are time barred to the extent they accrued on or before May 18, 2013; (2) Cox is entitled to summary judgment as to plaintiff's age discrimination claim under the ADEA; (3) Cox is entitled to summary judgment as to plaintiff's race discrimination claim under Title VII; (4) Cox is entitled to summary judgment on plaintiff's ADEA and Title VII retaliatory discharge claims; and (5) Cox is entitled to summary judgment on plaintiff's breach of contract

---

[7] Although charge no. 564-2014-00643 asserted discrimination based on sex, the Petition does not include a claim for sex discrimination. *See* [Doc. 2-1].

- 11 -

claim.   The court must consider whether defendant, in the motion for summary judgment, demonstrates that no genuine issue of material fact exists as to each proposition and therefore that it is entitled to judgment as a matter of law.[8]  *See Reed*, 312 F.3d at 1195

A.      *ADEA and Title VII Claims Accrued On or Before May 18, 2013*

Title VII imposes a charge filing requirement for allegedly unlawful employment practices, pursuant to which:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed by or on behalf of the person aggrieved *within three hundred days after the alleged unlawful employment practice occurred*.

*Lincoln v. BNSF Ry. Co.,* 900 F.3d 1166, 1181 (10th Cir. 2018) (emphasis in original) (quoting 42 U.S.C. § 2000e-5(e)(1)).[9]  "A plaintiff normally may not bring a Title VII action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue-letter."  *Id.* (quoting *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1194 (10th Cir. 2004)); *see also Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1846 (2019) ("As a precondition to the commencement of a Title VII action in court, a complainant must first file a charge with the Equal

---

[8] It should be noted that, in the stricken response, plaintiff did not respond to defendant's proposition one (as to ADEA and Title VII claims accrued prior to May 18, 2103), proposition four (ADEA and Title VII retaliatory discharge claims), and proposition five (breach of contract). Rather, plaintiff argues only that defendant is not entitled to summary judgment on plaintiff's claims for "discriminatory discharge" under Title VII and the ADEA.  [Doc. 135, p. 37].  Thus, plaintiff abandoned the remaining claims and defendant would be entitled to summary judgment on those claims on that basis alone had the response not been stricken.  *Hinsdale v. City of Liberal*, 19 F. App'x 749, 769 (10th Cir. 2001).

[9] Oklahoma is a deferral state and therefore a claimant has three hundred days from the date of the unlawful conduct to file a charge.  *Riley v. Tulsa Cty. Juvenile Bureau ex rel. Tulsa Cty. Bd. of Comm'rs*, 421 F. App'x 781, 783 (10th Cir. 2010).

Employment Opportunity Commission (EEOC or Commission).").  "A claim is time barred if it is not filed within the[] time limit[]."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).  The ADEA includes "virtually identical" charge filing requirements and therefore the court construes the ADEA and Title VII filing requirements consistently.  *Shikles v. Sprint/United Mgmt. Co.,* 426 F.3d 1304, 1309 (10th Cir. 2005) (quoting *Foster*, 365 F.3d at 1194)), *abrogated on other grounds by Lincoln*, 900 F.3d at 1185; *see also Riley*, 421 F. App'x at 783 ("Before a plaintiff may file suit under Title VII or the ADEA, he must exhaust his administrative remedies by filing a charge with the EEOC.").

Further, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Morgan*, 536 U.S. at 113.  Because each discrete discriminatory act starts a "new clock," a separate charge must be filed within the applicable time period.  *Id.*[10]  *See also Martinez v. Potter,* 347 F.3d 1208, 1210 (10th Cir. 2003) ("*Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted.").

The Tenth Circuit has recognized that when a Title VII or ADEA complainant "refuses or fails to provide the agency information sufficient to evaluate the merits of the claim, he or she 'cannot be deemed to have exhausted administrative remedies.'"  *Khader v. Aspin*, 1 F.3d 968, 971 (10th Cir. 1993) (quoting *Wade v. Sec'y of Army*, 796 F.2d 1369, 1377 (11th Cir. 1986)), *abrogated on other grounds, Lincoln,* 900 F.3d 1166; *see also Shikles*, 426 F.3d at 1311 ("[A] private sector

---

[10] This principle is inapplicable to hostile work environment claims.  *Morgan*, 536 U.S. at 115.  However, plaintiff does not assert a hostile work environment claim.

employee must cooperate with the EEOC in order for the employee to exhaust his or her administrative remedies under the ADEA."). The same is true if the complainant abandons the claim prior to a final agency determination. *Khader,* 1 F.3d at 971.

On December 21, 2012, plaintiff, through his then-counsel, submitted an intake questionnaire to the EEOC for the period from February 2, 2012 through December 20, 2012, asserting discrimination based on age, race, and sex. The intake questionnaire was assigned charge no. 564-2013-0034. However, defendant presents undisputed evidence that, on January 29, 2013, the EEOC informed it that charge no. 564-2013-0034 had been withdrawn due to plaintiff's failure to respond to communications from the EEOC, and that the EEOC was terminating the processing of the charge. The Tenth Circuit has held that complainant's failure to respond to EEOC requests for information amounts to a failure to exhaust. *See, e.g., Cirocco v. McMahon*, 768 F. App'x 854, 860 (10th Cir. 2019).[11] Thus, defendant's material facts, supported by undisputed evidence, demonstrates that plaintiff failed to cooperate with the EEOC relative to charge no. 564-2013-0034. Charge no. 564-2013-0034 therefore did not effectively exhaust plaintiff's administrative remedies with respect to alleged discriminatory or retaliatory acts that occurred during the period from February 2, 2012 through December 20, 2012.

The court next considers the extent to which plaintiff's second EEOC intake questionnaire and the related charge, designated EEOC charge no. 564-2014-00643, effectively exhausted plaintiff's administrative remedies. As previously stated, in a deferral state such as Oklahoma, a complainant must exhaust his administrative remedies by filing a charge within 300 days of the

---

[11] "Unpublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A).

- 14 -

alleged discriminatory act. *See Riley*, 421 F. App'x at 783. Each discrete discriminatory act requires a separate charge within the applicable time period. *Morgan*, 546 U.S. at 113. Defendant presents undisputed evidence that plaintiff filed the EEOC intake questionnaire with respect to charge no. 564-2014-00643 on March 14, 2014. Because each discrete discriminatory act constitutes "its own unlawful employment practice" requiring its own timely charge, charge no. 564-2014-00643 effectively exhausts administrative remedies only for those alleged discriminatory acts that occurred during the 300 day period prior to the filing of the charge. Defendant is entitled to judgment as a matter of law on plaintiff's claims to the extent based on discrete acts of alleged discrimination or retaliation that occurred on or before May 18, 2013.[12]

   B.   *Age Discrimination under the ADEA*

   Defendant next asserts that it is entitled to summary judgment as to plaintiff's claim for ADEA age discrimination because plaintiff cannot establish a *prima facie* case and, further, that defendant has set forth a legitimate, non-discriminatory reason for plaintiff's discharge that plaintiff cannot demonstrate was pretextual.

   The ADEA provides relief for acts of intentional discrimination based on age in employment. *See* 29 U.S.C. § 623; *Bennett v. Windstream Commc'ns, Inc.,* 792 F.3d 1261, 1266 (10th Cir. 2015). "A plaintiff can prove intentional discrimination through either direct evidence or circumstantial evidence that creates an inference of intentional discrimination." *Bennett*, 792 F.3d at 1266 (citing *Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir. 2015)). Where a plaintiff

---

[12] Cox does not argue that the exhaustion period should be measured from June 13, 2014—the date on which charge. no. 564-2014-00643 was perfected—rather than March 14, 2014—the date Palzer submitted the EEOC intake questionnaire. *See* [Doc. 114, pp. 28-29]. Thus, the court presumes that March 14, 2014 is the applicable date from which the exhaustion period must be measured.

relies on circumstantial evidence of intentional discrimination, the three-step burden shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), applies.[13]  *Id.*  Pursuant to the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a *prima facie* case of age discrimination.  If the burden is met, the burden of production shifts to the defendant to articulate "a legitimate, non-discriminatory reason" for its action.  Presuming the defendant produces a legitimate, non-discriminatory reason, the burden of production shifts to the plaintiff to "show that the defendant's explanation was merely pretextual." *Id.*

Defendant asserts that, to state a *prima facie* case of age discrimination, plaintiff must establish  he was "(1) 40 years or older, (2) performing satisfactory work, (3) suffered an adverse employment action, and (4) replaced by a substantially younger person."  [Doc. 114, p. 30 (citing *Thornton v. APAC, Inc*., No. 10-CV-095-GKF-PJC, 2012 WL 39381, at *4 (N.D. Okla. Jan. 9, 2012))].  Defendant contends that plaintiff cannot satisfy the second or fourth elements.  The court first considers the fourth element.

Defendant claims that plaintiff was not replaced by a younger person, and points to evidence that Stauffer did not hire anyone after plaintiff's discharge.  However, the fact that Stauffer did not hire anyone else does not establish that Palzer was not replaced by a younger person and therefore defendant fails to meet its burden to demonstrate that no genuine issue of material fact exists as to the fourth element.[14]

---

[13] Both defendant's motion for summary judgment and plaintiff's stricken brief in opposition apply the *McDonnell Douglas* burden-shifting framework, applicable when a plaintiff relies on circumstantial evidence of intentional discrimination.  *See* [Doc. 114 and Doc. 135].

[14] Someone other than Stauffer may have hired a younger person, or plaintiff's module may have been reassigned to a younger person.

With respect to the second element, defendant points to evidence that plaintiff was not performing satisfactorily.  *See* [Doc. 114, p. 30].  The Tenth Circuit has expressed a preference for "more concise formulations" of the *prima facie* elements of an age discrimination claim, that do not require plaintiff to establish satisfactory performance.  *Bennett,* 792 F.3d at 1266 n.1; *see also id.* ("A prima facie case generally requires a plaintiff to show, by a preponderance of the evidence, that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination."). In an unpublished decision, a Tenth Circuit panel reasoned "[a] defendant's evidence regarding an employee's work performance should not be considered when determining whether the employee has made a prima facie case of employment discrimination . . .  Instead, such evidence is appropriately considered during the next phase of *McDonnell Douglas'* three part analysis." *Ellison v. Sandia Nat'l Labs*., 60 F. App'x 203, 205 (10th Cir. 2003) (internal citations omitted). Accordingly, at least one court in this district has concluded that it is unnecessary for a plaintiff to show "satisfactory work" as part of a *prima facie* case in a discriminatory termination case.  *See Gibson v. Mabrey Bank*, No. 14-CV-0770-CVE-FHM, 2015 WL 5098698, at *6 (N.D. Okla. Aug. 31, 2015).  *But see Adamson v. Multi Cmty. Diversified Servs., Inc*., 514 F.3d 1136, 1144 (10th Cir. 2008) (agreeing with the general proposition that "under appropriate circumstances" pretext evidence may be useful to determine if plaintiff established a *prima facie* Title VII case).

The court need not decide the propriety of considering evidence of plaintiff's job performance to establish a *prima facie* claim in this case because, as discussed below, defendant provides undisputed evidence of a "legitimate, non-discriminatory" reason for terminating plaintiff that plaintiff fails to show is pretextual.  Therefore, defendant is entitled to summary judgment in its favor.

Defendant presents evidence of plaintiff's continued failure to meet his sales quota or to sustain performance improvement. *See* [Doc. 114-2, pp. 10-13, 23-25; Doc. 114-4, p. 11, ¶ 51]. Specifically, defendant offers evidence that, in 2012, Palzer failed to attain his sales quota in January, February, May, July, August, September, October, and December. [Doc. 114-2, pp. 10-13]. Additionally, in 2013, Palzer did not satisfy his sales quota in February, March, April, or May. Thus, over the course of his most recent seventeen months of employment, Palzer satisfied his quota only five times.[15] It is further undisputed that Palzer's three-month rolling average was below 80% in the three months immediately prior to his discharge.[16] [Doc. 114-2, pp. 10-11]. Finally, on October 24, 2012, Stauffer placed Palzer on a sixty-day PIP to run through December 2012, which, on January 8, 2013, was extended by thirty days. The thirty-day PIP extension specifically noted Palzer's three month cumulative installed quota and sold quota. [Doc. 114-1, p. 227]. Accordingly, defendant satisfied its burden of production to demonstrate a legitimate, non-discriminatory reason for plaintiff's termination.

Pursuant to the *McDonnell Douglas* framework, the burden would generally shift to plaintiff to produce evidence that defendant's explanation was pretextual. To defeat summary judgment, plaintiff "had to show 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [explanation] . . . that a reasonable factfinder could rationally find [it] unworthy of credence and hence infer that [Cox] did not act for the asserted non-discriminatory reasons.'" *Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1189 (10th Cir. 2010) (quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008)). In the context

---

[15] Even taking plaintiff's assertions in the stricken response as to his sales performance as true, plaintiff satisfied his sales quota only six times. *See* [Doc. 135, pp. 32-33, ¶ 76].

[16] Significantly, plaintiff did not purport to dispute his 2013 sales numbers in the stricken response.

of an ADEA claim, "it is not the employer's burden to negate any possible contributory role played by age in the challenged adverse action but, conversely, the employee's burden to show that age was the 'but for' cause of the action."  *Id.* at 1193 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).  For the reasons discussed above, plaintiff's response has been stricken.  Thus, plaintiff fails to satisfy his burden of production to demonstrate that defendant's asserted reason for terminating plaintiff is pretextual.

Even if the court were to consider plaintiff's stricken response, plaintiff fails to provide evidence to create a genuine dispute of material fact as to pretext.  Generally, a plaintiff may demonstrate pretext in three ways: "(1) with evidence that defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (3) with evidence that . . . he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."  *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000)).  But, as discussed below, plaintiff fails to show that a genuine issue of fact exists as to any of these three ways of demonstrating pretext.

*First,* plaintiff's stricken response fails to create a genuine dispute of material fact as to the falsity of defendant's stated reason for plaintiff's discharge.  Although plaintiff contends that Cox decisionmakers "misrepresented and/or willfully exaggerated" his low sales numbers, as discussed above, even taking plaintiff's assertions that defendant underreported his sales in 2012 and 2013 as true, plaintiff nevertheless failed to satisfy his quota in eleven of seventeen months.  Further, to determine whether a stated reason for discharge was pretextual, the court must "look at the facts as they appear to the person making the decision to terminate."  *Simmons v. Sykes Enters., Inc.*,

647 F.3d 943, 948 (10th Cir. 2011) (quoting *Kendrick*, 220 F.3d at 1231).  Evidence that the employer was mistaken in its reason for termination is insufficient to create a genuine dispute as to the credibility of defendant's asserted reason.  *Id.*  Accordingly, even if Palzer's sales figures were under reported, Cox's mistake—absent evidence of bad faith by those making the termination decision—is insufficient to create genuine question of fact.

*Second,* although plaintiff argues that defendant acted contrary to its written company policy by failing to place Palzer on a PIP immediately prior to his termination, the Cox Corrective Action policy specifically provides that the corrective action policy may not be followed "[w]hen management is of the opinion that remedial efforts are unlikely to be successful."  [Doc. 114-2, p. 34]; *see also* [Doc. 114-2, p. 36 ("In all cases, progressive discipline must follow the above outline unless the severity of the action warrants a different step.  Because unsatisfactory job performance and unacceptable conduct have different levels of seriousness, corrective action may occur at any level of the corrective action process.")].  Further, plaintiff criticizes defendant's reliance on his monthly sales quota (rather than his three month rolling average) as violating Cox's internal company policies, but plaintiff's position is contrary to the undisputed evidence, including the evidence cited by plaintiff.  *See, e.g.,* [Doc. 114, p. 11, ¶ 9 ("Account Executives are expected to meet 100% of their monthly sales quotas . . . ."); Doc. 114-4, p. 3, ¶ 7; Doc. 135-35, p. 82:19 to 83:3].[17]  Plaintiff's stricken response does not create a genuine dispute of material fact as to pretext based on asserted violations of defendant's policies.[18]

---

[17] The court notes that plaintiff submitted a rough draft of the deposition transcript of Melissa Cruts in the stricken response brief, rather than the official transcript.  *See* [Doc. 135-35].

[18] To the extent Palzer relies on evidence of his prior good performance evaluations and sales as evidence of the falsity of defendant's stated reason for his termination or that Cox acted contrary to its own internal policies, as recognized by the Tenth Circuit, "prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual.  To hold otherwise would be

*Third*, plaintiff fails to offer evidence that he was treated differently than similarly situated employees for comparable performance deficiencies.  As explained by the Tenth Circuit,

> [a]n employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the "same standards governing performance evaluation and discipline."  A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated.

*Kendrick*, 220 F.3d at 1232 (internal citation omitted) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)).  "[I]t falls on the employee alleging discrimination to rule out alternative explanations for the differential treatment."  *Roberts,* 733 F.3d at 1310 (citing *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120-21 (10th Cir 2007)).

In the stricken response, plaintiff contends that he received less favorable treatment than 27-year-old Campbell, 39-year-old Crawford, 31-year-old Finnefrock, 36-year old Young, and 30-year-old Harris, all of whom also failed to retain a three-month rolling sold to quota average over 80% in 2012.  However, defendant presents undisputed evidence that Harris was terminated for failing to make quota on May 12, 2012. *See* [Doc. 114-4, p. 7, ¶ 24].  Likewise, evidence submitted by plaintiff indicates that Young was terminated subsequent to plaintiff, on September 12, 2013, for failure to meet performance goals.  [ Doc. 135-1, p. 14 and 20].

Additionally, based on the summary judgment record, the court concludes that Campbell, Crawford, Finnefrock, and Young were not similarly situated to plaintiff and therefore evidence that the four received more favorable treatment is insufficient to create a genuine dispute of material fact as to pretext.  It is undisputed that Palzer began employment with Cox in 2005 and

---

to hold that things never change, a proposition clearly without basis in reality." *Roberts v. Int'l Bus. Machs. Corp.*, 733 F.3d 1306, 1309 (10th Cir. 2013) (quoting *Billet v. CIGNA Corp.*, 940 F.2d 812, 826 (3d Cir. 1991)).

moved to the Account Executive position on the Cox Business Inside Sales Team in March of 2008.  Plaintiff was subject to the monthly sales quota of $1,700 in 2011, $1,800 in 2012, and $1,900 in 2013, for the entirety of the respective years.  Cox placed plaintiff on a 30-day PIP on May 25, 2010; a 90-day PIP on March 9, 2012; and a sixty-day PIP on October 24, 2012, which was extended by 30 days on January 8, 2013.

In contrast, the employees not members of the age-protected class did not begin employment with Cox until 2012:  Campbell on May 26, 2012; Crawford on March 26, 2012; Finnefrock on August 18, 2012; and Young on May 29, 2012.  These employees were subject to a "ramp period" for the first four months of their employment, and therefore were not required to achieve the $1,800 monthly sales quota during the respective "ramp period."  Thus, the non-protected employees do not have similar work histories to plaintiff, and were not subject to the same sales quota attainment requirement as plaintiff in 2012.  Accordingly, evidence with respect to the employees cited by plaintiff is not probative of pretext and plaintiff fails to create a genuine dispute of material fact.

The court also notes that Stauffer, who made the recommendation to discharge plaintiff, was 51 and therefore was also a member of the protected class at the time of the employment decision.  Additionally, Means, Chandler, Romeike, and Ordoyne, all of whom approved Palzer's termination, were over 40 and members of the same protected class.   The fact that critical employees in the discharge decision were members of the same protected class belies any suggestion of pretext.  *Estate of Bassatt v. Sch. Dist. No. 1 in the City & Cty. of Denver*, 775 F.3d 1233, 1241 (10th Cir. 2014) (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991)).

- 22 -

Finally, plaintiff's reliance on certain age-based comments does not create a genuine dispute as to discriminatory animus or pretext. In the stricken response, plaintiff submits evidence that, during a team meeting on June 13, 2012, Stauffer ridiculed plaintiff for his age and, days later, demanded to know his age. [Doc. 140-2, p. 8, ¶¶ 18-19]. Additionally, plaintiff presents anecdotal evidence that, in June 2012, a co-worker overhead Stauffer stating that Stauffer believed Cox employed "too many old, white men." [Doc. 140, pp. 1-2]. However, these comments allegedly occurred in June of 2012—a year prior to plaintiff's discharge. Likewise, an incident in which Stauffer ordered plaintiff off of a bus occurred in June 2012. [Doc. 140-2, ¶ 16]. The court can discern no causal nexus between incidents that occurred in June 2012 and plaintiff's discharge a year later. *See Bolton v. Scrivner, Inc.*, 36 F.3d 939, 944 (10th Cir. 1994) (requiring nexus between comments and adverse employment decision).

The court is mindful that it is not the court's role to "act as a 'super personnel department' that second guesses employers' business judgments." *Simmons*, 647 F.3d at 948 (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)). It is possible that there were aspects of defendant's adoption of the zip-code module and subsequent sales quota attainment requirements that were unfair. However, plaintiff provides no evidence from which a finder of fact might reasonably infer that any unfairness amounts to intentional discrimination against plaintiff based on his age. Defendant is entitled to summary judgment as to plaintiff's age discrimination claim under the ADEA.

C.    *Race Discrimination under Title VII*

Defendant is also entitled to summary judgment as to plaintiff's race discrimination claim under Title VII. The *McDonnell Douglas* framework applies to claims for discriminatory termination on the basis of race under Title VII. *Plotke v. White,* 405 F.3d 1092, 1099 (10th Cir.

2005).  As discussed above, defendant satisfied its burden to produce evidence of a "legitimate, non-discriminatory reason" for plaintiff's discharge.  However, plaintiff fails to satisfy his burden of production to demonstrate that defendant's asserted reason for the termination is pretextual.  As previously discussed, plaintiff's response has been stricken and nothing in the evidence submitted by defendant suggests pretext.

Even considering plaintiff's stricken response, no dispute of material fact exists.  As discussed above, plaintiff fails to present evidence to demonstrate a genuine dispute of material fact as to whether defendant's stated reason for the discharge was false or that defendant acted contrary to its written policy.  Nor does plaintiff's stricken response create a genuine dispute of material fact as to whether he was treated differently than similarly situated employees.  As previously stated, Young, Campbell, and Crawford were not similarly situated, as they did not have similar work histories to plaintiff and were not subject to the same sales quota attainment requirement as plaintiff throughout 2012.  *See Kendrick*, 220 F.3d at 1232.  Moreover, plaintiff submits evidence with his response that Cox placed Young (an African-American male) on PIPs on March 8, 2013 and July 24, 2013 for failure to meet performance goals, culminating in his termination on September 12, 2013. [Doc. 135-1, pp. 14 and 20].  Similarly, Crawford (an African-American female) was placed on PIPs on February 1, 2013; June 24, 2013; and September 3, 2013 for failure to satisfy performance requirements, and discharged on September 14, 2013.  [*Id.* at pp. 14 and 19-20; Doc. 140-5, p. 3, ¶ 12].  Thus, plaintiff does not create a genuine dispute of material fact as to pretext based on differential treatment.

Plaintiff also submits evidence of alleged comments by Stauffer in February of 2012 that the sales team was "white male heavy" and that she intended to fill vacant positions with people of color.  [Doc. 140-6, p. 1, ¶ 4].  To that end, Stauffer allegedly told a Cox employee in April

2012 that a prospective employee would not be considered because Cox "already had too many white professionals working for it." [Doc. 140-4, ¶ 2]. In June 2012, co-worker, Carissa Nealis, reported alleged comments by Stauffer that Cox employed "too many old, white men," and she wished she could replace the men in her department with young African-Americans. [Doc. 140-3, pp. 1-2, ¶ 5]. Nealis expressed concern to HR Manager Cruts and Business Sales Director Jenney that Stauffer was discriminating against Palzer on the basis of his race. [*Id.* ¶ 4]. However, all of the alleged comments occurred over a year prior to plaintiff's discharge. Plaintiff therefore fails to show a sufficient causal connection between the comments and the adverse employment action. *See Bolton*, 36 F.3d at 944.[19] Further, the fact that Stauffer herself is Caucasian undermines any suggestion of pretext. *See Estate of Bassatt*, 775 F.3d at 1241.[20]

For the foregoing reasons, no genuine dispute of material fact exists as to defendant's legitimate, non-discriminatory reason for terminating plaintiff's employment. Defendant is entitled to summary judgment as to plaintiff's race discrimination claim under Title VII.

### D.   *Retaliatory Discharge under the ADEA and Title VII*

Plaintiff next asserts a claim for retaliatory discharge in violation of the ADEA and Title VII. The anti-retaliation provision of Title VII states, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

---

[19] For the same reason, an incident in which Stauffer ordered plaintiff off of a bus in June of 2012 does not create a genuine issue regarding pretext.

[20] In fact, it is undisputed that all the Cox personnel involved in the decision to discharge plaintiff were white.

42 U.S.C. § 2000e-3(a).  Likewise, the ADEA prohibits discrimination against employees because the employee "has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."  29 U.S.C. § 623(d).  The *McDonnell Douglas* burden-shifting framework applies to ADEA and Title VII retaliation claims.  The first, *prima facie* stage of the framework under both the ADEA and Title VII requires plaintiff to show that (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action.  *See Hinds v. Sprint/United Mgmt. Co.,* 523 F.3d 1187, 1201-02 (10th Cir. 2008) (ADEA claim); *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (Title VII).

Defendant does not dispute that plaintiff's December 21, 2012 EEOC intake questionnaire, designated unperfected charge no. 564-2013-0034, constitutes protected action, or that plaintiff's discharge was a materially adverse employment action.  However, defendant argues no causal connection exists between the protected activity—submitting the EEOC intake questionnaire—and plaintiff's discharge.

As previously stated, plaintiff's response has been stricken and, moreover, the stricken response brief includes no reference to, or argument regarding, this claim.  *See* [Doc. 135].  Thus, plaintiff effectively conceded the claim.  *See Hinsdale*, 19 F. App'x at 769.  Had plaintiff not conceded the claim, defendant would nevertheless be entitled to summary judgment because plaintiff presents no evidence from which a reasonable finder of fact could infer a causal connection between the protected activity and his discharge.

It is well-established in the Tenth Circuit that "the requisite causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (quoting *O'Neal v. Ferguson Constr. Co*., 237 F.3d 1248, 1253 (10th Cir. 2001)). "Where, however, 'very close temporal proximity between the protected activity and the retaliatory conduct' is lacking, 'the plaintiff must offer additional evidence to establish causation.'" *Id.* It is undisputed that plaintiff submitted the intake questionnaire on December 21, 2012, and the EEOC informed defendant that the charge was withdrawn on January 29, 2013. Defendant did not discharge plaintiff until June 10, 2013—nearly six months after plaintiff submitted the intake questionnaire and five months subsequent to the charge's withdrawal. The Tenth Circuit has consistently held that "a three-month period, standing alone, is insufficient to establish causation." *Id*. at 1181; *see also Nealis v. CoxCom, LLC*, No. 16-CV-0078-CVE-TLW, 2017 WL 1091786, at *5 (N.D. Okla. Mar. 22, 2017) (collecting cases), *aff'd*, 731 F. App'x 787 (10th Cir. 2018).[21] Thus, the nearly six months between plaintiff's protected activity and his discharge is too long a period to give rise to an inference of retaliation absent additional evidence. *See Nealis*, 731 F. App'x at 790. Plaintiff fails to submit any additional evidence to establish causation.[22] Accordingly, plaintiff fails to satisfy his burden of production as to a *prima facie* case

---

[21] The *Nealis* case was brought by Carissa Nealis, Palzer's former co-worker who reported her concerns to Cruts that plaintiff was the subject of discriminatory treatment by Stauffer. *Nealis,* 731 F. App'x at 788. The Tenth Circuit affirmed Judge Eagan's grant of summary judgment to Cox on Nealis's retaliatory discharge claim under Title VII. *Id.* at 791.

[22] To the extent plaintiff would rely on evidence purporting to demonstrate pretext, as recognized by the Tenth Circuit in *Nealis*, the court has "made clear that plaintiffs must still produce sufficient probative evidence to establish their prima facie case." *Nealis,* 731 F. App'x at 791 n.2.

of retaliation and defendant is entitled to summary judgment as to plaintiff's retaliation claims under the ADEA and Title VII.

> E.    Breach of Contract

Finally, the court considers plaintiff's breach of contract claim.  In the Petition, plaintiff asserts that defendant's progressive discipline policy constituted an enforceable contract, which defendant breached by terminating plaintiff without placing plaintiff on a PIP prior to his termination.  [Doc. 2-1, ¶¶ 27-31].

Oklahoma law recognizes that an employee handbook or policy can constitute an implied contract. *Gilmore v. Enogex, Inc.*, 878 P.2d 360, 368 (Okla. 1994).  An implied contract may exist when the promises contained in the handbook or policies are definite. *Id.*  Thus, although the existence of an implied contract is generally a question of fact, the issue can be decided as a matter of law "if the alleged promises are nothing more than vague assurances." *Hayes v. Eateries, Inc.*, 905 P.2d 778, 783 (Okla. 1995).

Defendant presents undisputed evidence that its progressive discipline policy includes no "definite" terms restricting Cox's ability to discharge its employees. *See* [Doc. 114-2, pp. 33-37]. Rather, the policy in effect at the time explicitly provided that the corrective action policy need not be followed under certain circumstances, including "[w]hen management is of the opinion that remedial efforts are unlikely to be successful." [*Id.* at p. 34].  Additionally, the policy states that:

> In all cases, progressive discipline must follow the above outline *unless the severity of the action warrants a different step*.  Because unsatisfactory job performance and unacceptable conduct have different levels of seriousness, *corrective action may occur at any level of the correction action process*.

[*Id.* at 36 (emphasis added)].  Factors to consider to determine the appropriate step of the corrective action include "[t]he quality of the employee's overall job performance" and the employee's willingness to improve performance.  [*Id.* at 33-34].  These terms do not "definitively" restrict

Cox's ability to discharge employees absent compliance with the progressive discipline policy, but instead permit defendant to assess the appropriateness of progressive discipline in light of the circumstances.   Accordingly, the corrective discipline policy does not constitute an implied contract and defendant therefore cannot be subject to liability for its breach.

Nor do the General Provisions of the sales compensation plan create a genuine dispute as to the existence of an implied contract.  *See* [Doc. 114-1, pp. 138-39].  It is undisputed that the General Provisions explicitly state that "[p]articipation in this plan is not a guarantee of employment for a specified period of time, and the company reserves the right to dismiss or discharge any participant at any time for any lawful reason."  [Doc. 114-1, p. 139].  The court declines to interpret the general provisions to negate the plain language of the corrective discipline policy and limit defendant's ability to terminate plaintiff.  *See Miner v. Mid-America Door Co.*, 68 P.3d 212, 222 (Okla. Civ. App. 2002).

Thus, no genuine issue of material fact exists as the existence of a contract and defendant is entitled to summary judgment as to the breach of contract claim.[23]

> F.    *Claims Against Defendants Cox Oklahoma Telcom, LLC; Cox Communications, LLC; Cox Communications; and Cox Communications Kansas, LLC*

Defendants Cox Oklahoma Telcom, LLC; Cox Communications, LLC; Cox Communications; and Cox Communications Kansas, LLC have not been served and therefore do not seek summary judgment.  The docket reflects that these defendants were never served and, further, plaintiff dropped the defendants from the caption.  *See, e.g.,* [Doc. 63].  Accordingly, these defendants are entitled to summary judgment on this basis alone.  *See Zinna v. Cook*, 428 F. App'x

---

[23] As previously stated, plaintiff's stricken response includes no argument directed to this claim and therefore plaintiff has conceded the claim.  *See Hinsdale*, 19 F. App'x at 769.

838, 841 (10th Cir. 2011) (affirming grant of summary judgment to defendant "who had disappeared from the litigation by the time summary judgment proceedings were initiated").[24]

## V.    Conclusion

WHEREFORE, Defendant CoxCom, LLC's Motion for Summary Judgment [Doc. 114] is granted.

DATED this 17th day of September, 2019.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

---

[24] Additionally, as recognized by the United State Supreme Court, a district court possesses the power to enter summary judgment *sua sponte*, "so long as the losing party was on notice that [it] had to come forward with all of [its] evidence." *Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986). Interpreting this standard, the Tenth Circuit has held "[t]he entry of summary judgment sua sponte is warranted only when the following conditions are met: (1) there is no dispute of material fact; (2) the losing party has had an adequate opportunity to address the issues involved, including an adequate time to develop any facts necessary to oppose summary judgment." *David v. City & Cty. of Denver*, 101 F.3d 1344, 1358-59 (10th Cir. 1996). "When a district court's *sua sponte* determination is based on issues identical to those raised by a moving party, the risk of prejudice is significantly lowered because 'the judge already is engaged in determining whether a genuine issue of material fact exists and the parties have been given an opportunity to present evidence designed either to support or refute the request for the entry of judgment.'" *Kannady v. City of Kiowa,* 590 F.3d 1161 (10th Cir. 2010) (quoting 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed.1998)). In this case, plaintiff presents no evidence of pretext, discriminatory animus, or implied contract and therefore summary judgment is appropriate. Because these issues are identical to those raised by CoxCom, LLC, as the moving party, summary judgment in favor of the nonmoving defendants is appropriate on this alternative basis.

# **Attachment 2**

# *Judgment*

**September 17, 2019**
**Dkt. #172**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

MARK ANTHONY PALZER,                          )
                                              )
                    Plaintiff,                )
                                              )
v.                                            )          Case No. 15-CV-00564-GKF-JFJ
                                              )
COXCOM, LLC d/b/a COX                         )
COMMUNICATIONS TULSA,                         )
                                              )
                    Defendant.                )

## JUDGMENT

Pursuant to the court's Order of September 17, 2019 granting summary judgment in favor

of defendant CoxCom, LLC d/b/a Cox Communications Tulsa, it is herby ordered that plaintiff

Mark Anthony Palzer recover nothing, and that the action be dismissed on the merits.

ENTERED this 17th day of September, 2019

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

# **Attachment 3**

# *Order*

[overruling *Objection to Magistrate Judge's [10/03/2018] Order Denying Motion to Compel Compliance with Fed.R.Civ.P. 30(b)(6)*]

**April 26, 2019**
**Dkt. #164**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MARK ANTHONY PALZER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-CV-00564-GKF-JFJ |
| | ) | |
| COX OKLAHOMA TELCOM, LLC | ) | |
| and COXCOM, LLC d/b/a COX | ) | |
| COMMUNICATIONS TULSA, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter comes before the court on the Objection to Magistrate Judge's October 3rd

Order Denying Motion to Compel Compliance with FED. R. CIV. P. 30(b)(6) [Doc. 126] of plaintiff

Mark Anthony Palzer. For the reasons discussed below, the objection is denied.

**I.    Background/Procedural History**

This case has a lengthy procedural history which the court will not belabor. Relevant to

plaintiff's objection, Palzer asserts claims for discrimination based on age and retaliatory discharge

in violation of Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et*

*seq*.; discrimination based on race and retaliatory discharge in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq*; and breach of contract.[1]  During the course of

discovery, Palzer did not propound written requests for production or interrogatories to Cox.

However, Palzer did issue a Notice of Deposition and Subpoena to Appear to defendant CoxCom,

---

[1] Plaintiff's Petition for Wrongful Termination and Discrimination in Employment also asserted claims under the Oklahoma Anti-Discrimination Act ("OADA"), 25 Okla. Stat. §§ 1101 *et seq*.  In its Opinion and Order dated July 3, 2018, this court dismissed plaintiff's OADA claims. *See* [Doc. 102].

LLC d/b/a Cox Communications Tulsa ("Cox"), identifying twenty-nine (29) separate topics as matters for examination.  On August 23, 2018, Palzer deposed Melissa Mason Cruts as Cox's designated FED. R. CIV. P. 30(b)(6) corporate representative.  At the outset of the deposition, Cox provided Palzer with 278 pages of documents organized and tabbed by Palzer's deposition topic numbers, as well as an eighteen-page outline that included responsive information to the deposition topics.  *See* [Doc. 119, p. 10; Doc. 119-5].

On September 6, 2018, counsel for Palzer, Christopher Camp, made an unannounced visit to the offices of counsel for Cox, Keith Wilkes, and advised Wilkes that he did not believe that Cruts fully addressed Palzer's deposition topic nos. 5 and 23.[2]  *See* [Doc. 119-1, p. 2, ¶¶ 3-5].  Wilkes explained that he did not recall the testimony related to topic no. 5 and that his recollection of the testimony related to topic no. 23 differed from that of Camp.  Because Wilkes had not yet received a transcript of Cruts's deposition, Wilkes advised that he would contact Camp later to properly address the two topics.  [*Id.* p. 3, ¶¶ 6-8].  Camp sent an e-mail to Wilkes that same day "following up on our Rule 37 conference" and suggesting that additional document production by Cox may resolve the alleged deficiency.  [Doc. 119-2].  Wilkes responded the next day stating that he would review Cruts's deposition transcript over the weekend and advise.  [Doc. 119-3].  Five days later, on September 11, 2018, Wilkes sent a letter to Camp that 1) objected to Camp's characterization of the September 6 conversation as a Rule 37 conference, 2) outlined Cox's position that Cruts provided adequate testimony regarding topic no. 23, and 3) requested additional

---

[2] Topic no. 5 related to "[p]laintiff's performance evaluations and all substantive information, data, and/or records upon which such evaluations, or any component thereof, were based."  [Doc. 110-1, p. 5].  Topic no. 23 sought testimony regarding "[t]he substance of, and the basis for, any and all complaints made (internally or externally), investigations conducted, counseling given, and/or discipline administered to Shelley Stauffer [plaintiff's supervisor] (including, without limitation, any and all reasons for the termination of Stauffer's employment)."  [*Id.* p. 8].

information with respect to Palzer's objection to Cruts's testimony regarding topic no. 5 so that Wilkes could "properly respond." *See* [Doc. 119-4].

Palzer subsequently filed the Motion for Order Compelling Defendant to Submit for Deposition under FED. R. CIV. P. 30(b)(6) by Presenting a Designee Who is Properly Prepared to Testify Regarding Examination Topic Nos. 3, 5-6, 9, 13, 15, 23, and 25-26. *See* [Doc. 110]. The motion certified that Palzer complied with FED. R. CIV. P. 37(d)'s requirement to confer with opposing counsel. Pursuant to 28 U.S.C. § 636, this court referred Palzer's motion to U.S. Magistrate Judge Jayne. On October 3, 2018, the parties appeared before the magistrate judge for a hearing on the motion. At the close of argument, Magistrate Judge Jayne issued an order from the bench denying Palzer's motion. Palzer now seeks review of Magistrate Judge Jayne's order pursuant to FED. R. CIV. P. 72(a). *See* [Doc. 126].

## II.    Standard

Pursuant to 28 U.S.C. § 636, subject to certain exceptions, "[a] judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court[.]" 28 U.S.C. § 636(b)(1)(A). A party may seek review by the district judge of a magistrate's judge order by filing an objection within fourteen (14) days of being served with a copy of same. FED. R. CIV. P. 72(a). "Rulings by Magistrate Judges that fall within this general grant of authority are reviewed under a 'clearly erroneous or contrary to law' standard." *Jama v. City & Cnty. of Denver*, 304 F.R.D. 289, 294 (D. Colo. 2014); *see also* FED. R. CIV. P. 72(a) ("The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."). The clearly erroneous standard requires the district court to affirm unless it "on the entire evidence is left with the definite and firm conviction that a mistake

has been committed." *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988) (quoting *United States v. U.S. Gypsum Co*., 333 U.S. 364, 395 (1948)).

## III.    Analysis

Palzer argues the magistrate judge "committed clear error and acted contrary to the law" in twelve (12) separate ways.  The court first addresses Palzer's objections with respect to the magistrate judge's findings of procedural deficiencies and then addresses the magistrate judge's conclusions with respect to the merits of the motion to compel.

### A.    *Objections Based on Consideration of Procedural Deficiencies (Objection Nos. 1, 2, 10, and 11)*

The court will consider Palzer's first and second objections, which are based on the magistrate judge's conclusions related to the Rule 37 conference.  [Doc. 126, pp. 2-4, ¶¶ 1-2].

In objection 2(b), Palzer argues that the magistrate judge erred in failing to weigh the prejudice to him by resolving the motion strictly on the basis of a procedural defect, rather than the merits.  However, the objection is unfounded, as the transcript shows that the magistrate judge resolved the motion on alterative grounds, both procedural and substantive:

```
        And finally, I'm going to go through some merits-based
issues.  But even assuming there were no procedural
deficiencies in the motion at all, the court would deny the
motion on the merits.  The standard is the designee must be
prepared enough to give, quote, complete, knowledgeable, and
binding answers on behalf of the corporation with respect to
the topics listed.
        I have carefully reviewed all the portions of testimony
```

> provided by both parties, and I find that on a global basis
> Ms. Cruts was adequately prepared and adequately answered as to
> all of topics 3, 5, 6, 9, 13, 15, 23, and 25 through 26 for the
> reasons stated by defendant in its brief.
>
> Further, defendant provided documents and an outline of
> documents responsive to each topics despite plaintiff's failure
> to request any documents during discovery.  Plaintiff has
> pointed out, both in its motion and in this hearing, a few
> instances that Ms. Cruts said "I don't know" and did not know
> certain details.  However, upon review of her testimony as a
> whole, the court finds this does not reflect a lack of adequate
> preparation as to any topic.
>
> I have reviewed the alleged deficiencies that are cited
> in plaintiff's brief, and I find no serious problems or lack of
> preparedness to indicate defendant violated its duties to
> prepare this witness on the topics requested or that the
> witness failed to offer complete and binding answers on behalf
> of the corporation.

Thus, Magistrate Judge Jayne considered, and alternatively resolved the motion to compel on, the

merits of Palzer's asserted deficiencies with respect to each topic.[3]

In objection 2(a), Palzer objects to the magistrate judge's failure to take into account "the

clear fact" that further communications with defendant's counsel regarding Cox's alleged non-

compliance with Rule 30(b)(6) would have been futile.  Palzer is correct that it is within the court's

discretion to waive strict compliance with conference requirements when the circumstances

indicate that judicial efficiency or justice is best served by resolution on the merits.  *Rigdon v.

Flowserve Corp.*, No. 16-CV-81-GKF-FHM, 2017 WL 2821939, at *1 (N.D. Okla. June 29, 2017);

*Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D. 295, 302 (D. Kan. 1996).  Here, as

---

[3] Had the magistrate judge resolved the motion purely on procedural grounds based on Palzer's failure to satisfy Rule 37's conference requirement, she would have been justified in doing so.  *See Johnson v. Old Republic Ins. Co.*, No.10-CV-460-JHP-FHM, 2012 WL 1672995, at *2 (N.D. Okla. May 14, 2012).

previously stated, Magistrate Judge Jayne alternatively assumed no procedural deficiencies existed and proceeded to analyze the content of Cruts's testimony with respect to each topic. Thus, the magistrate judge considered the merits of Palzer's motion despite Palzer's noncompliance with Rule 37's conference requirements (regardless of Palzer's reason for the omission) and no error occurred.

In objection no. 1, Palzer objects to the magistrate judge's conclusion that no Rule 37 conference occurred with respect to deposition topic nos. 3, 6, 9, 13, 15, 25, and 26. Palzer contends his efforts were "reasonable under the circumstances." [Doc. 126, pp. 2-3, ¶ 1]. However, as correctly determined by the magistrate judge, Palzer's failure to confer on all topics other than nos. 5 and 23 does not satisfy the requirements of Rule 37. "One purpose of the meet and confer requirement is to promote discussion of *specific issues* and the exchange of additional information." *Johnson*, 2012 WL 1672995, at *1 (emphasis added). Palzer does not contend that he raised any topics other than nos. 5 and 23 with counsel for Cox during the September 6 discussion. Nor does Camp's e-mail of that day refer to any specific testimony by Cruts he contends was deficient. *See* [Doc. 119-2]. Objections must be specifically raised with respect to each Rule 30(b)(6) deposition topic to which a deficiency exists. Permitting a movant to raise some, but not all, of their disputed discovery issues violates both the letter and spirit of Rule 37 and would put the non-movant at a significant disadvantage. The parties cannot be expected to engage in good-faith discussions when one party is in the dark as to the scope of the objections. *See Benavidez v. Sandia Nat'l Labs.*, 319 F.R.D. 696, 723 (D.N.M. 2017) ("[F]or there to be a good-faith meet and confer, there must be a conference where the parties come together to compare their views. A conference has an element of concurrence, simultaneous occurrence, and contemporaneousness."). Thus, the court concurs with the magistrate judge that no Rule 37

conference occurred with respect to deposition topics nos. 3, 6, 9, 13, 15, 25, and 26, and that plaintiff's motion to compel could be denied on that procedural basis alone, though it was not.

In his tenth (10th) objection, Palzer objects to the magistrate judge's observation that the Rule 30(b)(6) deposition was the sole method of discovery plaintiff conducted in this case.  In his eleventh (11th) objection, Palzer objects to the magistrate judge's comment regarding the potential prejudice to defendant in reopening the 30(b)(6) deposition.  *See* [Doc. 126, p. 6, ¶¶ 10-11]. Discovery in this matter closed on September 4, 2018.  *See* [Doc. 101, p. 1].  However, Palzer did not file his motion to compel until September 17, 2018, nearly two weeks after the discovery deadline.   [Doc. 110].   Thus, Palzer's motion to compel "s[ought], in essence, to re-open discovery."  *See AG Equip. Co. v. AIG Life Ins. Co.*, No. 07-CV-556-CVE-PJC, 2009 WL 36493, at *1 n. 3 (N.D. Okla. Jan. 5, 2009) (quoting *Am. Motorists Ins. Co. v. Gen. Host Corp.*, 162 F.R.D. 646, 647 (D. Kan. 1995)).   The Tenth Circuit has articulated six relevant factors to determine whether discovery should be reopened, and the factors specifically include "whether the non-moving party would be prejudiced" and "whether the moving party was diligent in obtaining discovery within the guidelines established by the court."  *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1514 (10th Cir. 1990).[4]  Thus, the magistrate judge did not commit clear error in noting the limited discovery Palzer conducted and the potential prejudice to Cox to determine whether to compel additional 30(b)(6) deposition testimony.

B.      *Objections Based on the Magistrate's Consideration of the Merits (Objection Nos. 3 thru 9)*

Palzer asserts seven (7) objections to the magistrate judge's conclusions with respect to the merits of the motion to compel—two with respect to the magistrate judge's conclusions regarding

---

[4] Palzer cites case law related to Rule 56(d) motions to support his contention that an error occurred.  *See* [Doc. 126, p. 6 n. 8].  However, Palzer did not file a Rule 56(d) motion.

the documents and outline provided by Cox and five with respect to Cruts's testimony. The court first considers Palzer's objections to Cruts's testimony.

### 1.    Objections Related to Testimony

Palzer contends that the magistrate judge erred by "holding that 'even assuming there were no procedural deficiencies in [Plaintiff's September 17th] *Motion* at all, the Court would deny the *Motion* on the merits[.]'" [Doc. 126, p. 4, ¶ 3].  However, this objection lacks sufficient specificity and is therefore overruled.  *See Fisher v. Sw. Bell Tel. Co.,* No. 07-CV-0433-CVE-FHM, 2009 WL 936712, at *7 (N.D. Okla. Apr. 6, 2009) ("This Court does not review a non-dispositive ruling of a magistrate judge unless a party raises a specific and timely objection to a particular ruling.").

Similarly, Palzer objects to the magistrate judge's conclusion that Cruts was adequately prepared and provided adequate testimony with respect to topic nos. 3, 5, 6, 9, 13, 15, 23, 25, and 26 pursuant to FED. R. CIV. P. 30(b)(6), despite:

> (a)    the 30(b)(6) witness' admitted and/or apparent inability to testify regarding topics specifically articulated by Plaintiff's 30(b)(6) deposition notice (including Topic Nos. 5 and 23);
>
> (b)    the witness' admitted failure to review records known to be in Cox's possession that directly relate to the designated area(s) of inquiry (including Topic Nos. 5 and 23); and
>
> (c)    the witness' claimed lack of familiarity with, and/or knowledge of, information readily available to Cox that was specifically sought by way of the 30(b)(6) deposition notice.

[Doc. 126, pp. 4-5, ¶ 6 (footnote omitted)].  Again, Palzer's objection lacks the necessary specificity.  Nevertheless, the court has reviewed the entirety of the deposition testimony and its adequacy with respect to each disputed deposition topic.

As recognized by the magistrate judge, to satisfy Rule 30(b)(6), a corporate deponent must make available a witness capable of providing "complete, knowledgeable and binding answers[.]"

*S.E.C. v. Goldstone*, 301 F.R.D. 593, 646-47 (D.N.M. 2014) (quoting *Reilly v. Natwest Mkts. Grp. Inc.,* 181 F.3d 253, 268 (2d Cir. 1999)).  "A deponent under Rule 30(b)(6) has an affirmative obligation to educate himself as to the matters regarding the corporation.  This includes all matters that are known or reasonably available to the corporation." *Id.* at 647 (quoting *Concerned Citizens of Belle Haven v. Belle Haven Club*, 223 F.R.D. 39, 43 (D. Conn. 2004)).  Based on its independent review of the deposition transcript, the court concludes Cruts was adequately prepared and provided sufficiently complete, knowledgeable, and binding answers with respect to each deposition topic of which she was questioned.

        a.       Topic No. 3

Topic No. 3 requested testimony as to "information regarding any conversion 'to a module sales territory' that affected or applied to any Cox Business sales teams or Account Executives in Oklahoma[.]"  [Doc. 110-1, pp. 4-5, ¶ 3].  The court concludes Cruts provide sufficiently complete and knowledgeable answers regarding this topic at pages 27-30, 31-35, 55-68, and 203-207 regarding this topic.  Although the court notes that Cruts, at times, testified she "did not have" certain information or "did not know," the majority of these instances were in response to questions posed regarding the assignment of zip codes several months after Cox's initial assignment of the codes and conversion to the "module sales territory."[5]  *See* [Doc. 110-10, pp. 136:18-21; 137:6 to 138:17; 140:25 to 142:10; 160:2-15; 161:9 to 163:3].  Inquiries directed to events occurring after the initial assignment of zip codes and conversion to the "module sales territory" fall outside the

---

[5] The remaining deposition excerpts relied upon by plaintiff with respect to topic no. 3 in his motion to compel provide no basis upon which the court may find clear error. *See* [Doc. 110-10, p. 61:5-16 (testimony that Cruts could not explain what Stauffer meant by her use of the word "newer" in an e-mail); and Doc. 110-10, p. 63:5-12 (testimony that Cruts did not know if Stauffer attempted to assign zip codes to be geographically close but going on to explain that Stauffer considered team members' personal preferences with respect to total values, as well as equity).

scope of the Rule 30(b)(6) deposition notice.[6]  Thus, Cox satisfied its Rule 30(b)(6) obligations with respect to topic no. 3.

                    b.      Topic Nos. 5 and 6

Topic No. 5 requested testimony regarding "[Palzer's] performance evaluations and all substantive information, data, and/or records upon which such evaluations, or any component thereof, were based."   Topic No. 6 requested testimony regarding "[a]ny Performance Improvement Plan pertaining to [Palzer], and all substantive information, data, and/or records upon which such P.I.P's, or any component thereof, were based."  The court concludes Cruts provided sufficiently complete and knowledge responses on these topics.  *See* [Doc. 119-6, pp. 90:2 to 116:24; 132:6 to 135:22; 198:14 to 200:5; and 211:12 to 213:23].

Palzer specifically objects to the magistrate judge's conclusion that Cruts provided sufficient testimony with respect to selling outside the module and that any details she lacked did not warrant reopening or redeposing the witness.  Based on its review, the court concurs with the magistrate judge that Cruts provided sufficient testimony with respect to this topic.  Cruts testified that, during the transition to the module strategy, Cox split credit for any sales made outside the

---

[6] Palzer also contends the magistrate judge committed clear error in concluding that the identified deposition excerpts included in Palzer's motion to compel fell outside the scope of topic no. 3. However, based on this court's independent review, the testimony clearly relates to events occurring after August of 2012.  Stauffer assigned the modules in March of 2012, and Cox converted to the "module sales territory" strategy in April of 2012.  Deposition topic no. 3 requested testimony regarding the identify of employees who participated in the *decision to undergo the conversion*; factors Cox considered in *the decision to convert*; the development and selection of criteria *for determining* the assigned modules; correspondence in connection with a *March 2012* directive for each team member to submit his top three desired areas; the particulars of each instance when performance was used as tiebreaker *in assigning* the zip codes; and the performance history of employees relative to whom performance was used as a tie breaker.  Thus, the court construes topic no. 3 as limited to Cox's initial assignment of the zip codes and conversion to the "module sales territory" strategy.  The magistrate judge did not err in concluding the disputed testimony fell outside the scope of topic no. 3.

module, but after the transition period, an employee forfeited any sales made outside the module to the module's owner.  [Doc. 119-6, p. 169:1-11].  Cruts stated the managers, with director approval, could approve splits and that splits were then sent to the sales compensation team for processing.  [*Id.* pp. 169:12 to 170:9].  Cruts explained that Palzer was not credited for sales made outside of his module in 2012, and that Palzer's explanation as to the sales only related to two of nine accounts.  [*Id.* pp. 149:3 to 150:19 and 192:7 to 194:14].  Although Cruts could not recall certain details with respect to the specific accounts at issue, "Rule 30(b)(6) is not designed to be a memory contest."  *Schneider v. CitiMortgage, Inc*., No. 13-4094-SAC, 2017 WL 4882663, at *3 (D. Kan. Oct. 30, 2017).

Further, Cox provided Palzer with thirty (30) pages of Palzer's performance evaluations and an additional seventeen pages related to performance improvement plans.  [Doc. 119-5, p. 5].  Cox also provided Palzer with performance improvement plan information with respect to his co-workers in 2012 and 2013 and annual performance reviews from 2012.  [Doc. 119-5, pp. 3-5].  Although document production alone does not satisfy a corporate entity's Rule 30(b)(6) obligations, discovery must be "proportional to the needs of the case," considering, among other things, the parties' relative access to relevant information.  FED. R. CIV. P. 26(b)(1).  As previously stated, Cruts provided adequate testimony regarding sales made outside the module and, further, Palzer received documents directly responsive to the topics.  Requiring further testimony with respect to the topic would be disproportional to the needs of the case in light of Palzer's access to responsive documents.  Based on the testimony and documents previously produced, the court concurs with the magistrate judge that any details Cruts lacked do not warrant reopening or redeposing Cruts.

c.      Topic No. 9

Topic No. 9 requested testimony regarding, "[f]or the period of January 1, 2010 through June 10, 2014, the identity of each Cox Business Account Executive in Tulsa (including any and all individuals supervised by Shelley Stauffer) who was placed on a Performance Improvement Plan or otherwise counseled or disciplined as a result of his or her performance and/or failure to meet periodic performance goals."  Palzer raises no specific objections to the magistrate judge's conclusions regarding topic no. 9, nor did he assert any specific deficiencies in his motion to compel.  The court may overrule Palzer's objection on this basis alone.  However, the court has reviewed the transcript of Cruts's deposition and concludes that Cruts provided sufficient testimony with respect to this topic.  *See* [Doc. 119-6, pp. 182:16 to 201:13].  Further, in the outline, Cox provided information regarding each employee within Palzer's team who was placed on a PIP from December 2012 to September 2013.  [Doc. 119-5, p. 6].  Thus, the court finds no error in the magistrate judge's denial of Palzer's motion to compel with respect to topic no. 9 on the merits.

d.      Topic 13

Topic No. 13 requested testimony regarding "[d]efendant's decision to terminate Plaintiff's employment, including all reasons for such termination, and the identity of all records (including, without limitation, internal correspondence) generated and/or exchanged during, or otherwise materially relating to, such decision and decision-making process."  [Doc. 110-1, p. 6].  Again, Palzer failed to raise a specific objection with respect to the magistrate judge's conclusions regarding topic no. 13.  Nor did Palzer identify any testimony indicating a deficiency in his motion to compel.  Further, based on this court's review of the deposition transcript, Cruts provided

complete and knowledgeable testimony regarding Cox's decision to terminate Palzer's employment.  *See* [Doc. 119-6, pp. 186:23 to 189:4 and 192:1 to 197:5].

e.   Topic No. 15

Topic No. 15 requested testimony regarding "[t]he content of any Termination Review Form prepared in connection with the termination of [Palzer's] employment, and the complete evidentiary basis for any statements made therein regarding the reason for separation."  Palzer again fails to identify any specific objection with respect to the magistrate judge's conclusions, nor does he identify any testimony to substantiate the alleged deficiency in his motion to compel. Further, although Cox provided Palzer the Termination Review Form, the record indicates that Palzer's counsel failed to question Cruts regarding the Termination Review Form.  *See* [Doc. 119-5, p. 15 and Doc. 119-6].  Plaintiff cannot complain of the inadequacy of testimony that he did not seek to elicit.  Accordingly, the magistrate judge did not err in denying plaintiff's motion to compel on the merits with respect to this topic.

f.   Topic No. 23

Topic No. 23 sought testimony regarding "[t]he substance of, and basis for, any and all complaints made (internally or externally), investigations conducted, counseling given, and/or discipline administered to Shelley Stauffer (including, without limitation, any and all reasons for the termination of Stauffer's employment)."  Palzer objects to the magistrate judge's conclusion that no deficiencies existed as to Cruts's testimony or preparation to warrant requiring any further Rule 30(b)(6) testimony.

As noted by the magistrate judge, Cruts testified that Cox terminated Stauffer for unprofessional conduct, specifically making "inappropriate comments to a team member."  [Doc. 119-6, p. 130:19 to 131:4].  Palzer contends that Cruts failed to provide "any additional substantive

information or particulars at all."  However, Palzer's position is not borne out by the record.  When questioned regarding the particulars, Cruts testified that Stauffer told a team member "I should have thought twice about hiring you," and "[i]f you would have had a college degree, you would have known that."[7]  [*Id.* pp. 130:25 to 131:4.  Although Cruts did not know the identity of the specific individual to whom the comments were directed, Cruts testified that the comments were made in a team meeting of Stauffer's team and that Stacy Crawford reported the statements to management, resulting in an investigation.  [*Id.* pp. 131:8-16 and 164:11-22].  Thus, Cruts provided specific, substantive information regarding the reasons for Stauffer's termination.  The court concludes the testimony satisfies the requirements of Rule 30(b)(6) and no further testimony is required.

g.      Topic Nos. 25 and 26

Topic No. 25 requested testimony regarding "[s]teps taken by Defendant, if any, to comply with the Federal Rules of Civil Procedure concerning the preservation and production of electronically-stored information in this case."  Topic No. 26 sought testimony regarding "[d]efendant's document and data retention and preservation policies and procedures, document and data storage and retrieval systems, and the methods of storage for documents and categories of documents relating to litigation (including this case) and prospective litigation."

Again, Palzer fails to raise a specific objection with respect to the magistrate judge's conclusions regarding this topic and did not identify any specifically deficient testimony in his

---

[7] Palzer also objects to the magistrate judge's conclusion that the two examples testified to by Cruts were not "anecdotal references."  However, Cruts's testimony provides specific, substantive factual examples of the inappropriate comments made to a team member that resulted in Stauffer's termination for unprofessional conduct.  Moreover, Palzer points to no testimony suggesting that Cox based its decision to terminate Stauffer on any comments other than the two statements identified, nor has the court independently identified any such testimony.  Thus, the testimony is not "anecdotal" and no error occurred.

motion to compel. Further, based on the court's review of the deposition transcript, Palzer's attorney directed only one question to Cruts that fell within the scope of this topic. [Doc. 119-6, pp. 162:25 to 163:2]. However, the question concerned the preservation of information related to the assignment of modules after Cox's conversion to the "module sales territory" system and therefore fell outside the scope of topic no. 3. Finally, the court notes that Palzer did not propound written requests for production to Cox or issue a subpoena duces tecum in connection with the Rule 30(b)(6) deposition. Based on these considerations, no further Rule 30(b)(6) testimony was warranted and the magistrate judge committed no error.

2.     <u>Objections Related to Consideration of Documents and Outline</u>

Finally, Palzer objects to the magistrate judge's consideration of the documents and outline voluntarily produced by Cox. First, Palzer argues that the magistrate judge incorrectly found that Cox provided documents and an outline responsive to each topic. [Doc. 126, p. 4, ¶ 4]. Palzer contends that Cox did not produce documents or outline material with respect to topic nos. 23, 25, and 26.[8] Palzer is correct that Cox provided no documents with respect to these topics. However, as set forth above, the court concludes that Cruts's testimony satisfied Cox's Rule 30(b)(6) obligations with respect to topic no. 23. Further, based on Palzer's failure to elicit testimony with respect to topic nos. 25 and 26, no further Rule 30(b)(6) testimony was warranted. Thus, based on the entirety of the evidence, the court finds no inadequacy in Cruts's preparation or testimony, and no further Rule 30(b)(6) testimony is necessary.

---

[8] Palzer also notes that Cox did not produce documents related to topic nos. 17 through 20. However, topic nos. 17 through 20 were not the subject of Palzer's motion to compel. "[T]heories or arguments raised for the first time in objections to a magistrate judge's order are deemed waived." *Amaya v. Bregman*, No. 14-CV-0599-WJ-SMV, 2016 WL 10516169, at \*2 (D.N.M. Mar. 7, 2016).

Cruts also objects to the magistrate judge's consideration of the documents produced by Cox.[9]  However, as previously stated, pursuant to FED. R. CIV. P. 26(b), parties may obtain discovery that is "proportional to the needs of the case" based on various considerations, including "the parties' relative access to relevant information."  The Cox documents provided Palzer access to relevant information, a consideration to determine the scope of discoverable information.  Thus, the magistrate judge correctly applied FED. R. CIV. P. 26(b) and no error occurred.[10]

## IV.    Conclusion

WHEREFORE, plaintiff Mark Anthony Palzer's Objection to Magistrate Judge's October 3rd Order Denying Motion to Compel Compliance with Fed. R. Civ. P. 30(b)(6) [Doc. 126] is denied.

DATED this 26th day of April, 2019.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

---

[9] Palzer contends the magistrate judge concluded that the document production satisfied Cox's testimonial obligations under FED. R. CIV. P. 30(b)(6).  [Doc. 126, p. 4, ¶ 5].  This is incorrect. Magistrate Judge Jayne noted the document production and outline as one consideration in her determination of the adequacy of Cruts's preparation.  Further, Magistrate Judge Jayne specifically concluded that Cruts provided complete and binding answers on behalf of Cox.

[10] Because the court concludes the magistrate judge's decision denying the motion to compel was not clearly erroneous or contrary to law, the court concludes no error exists with respect to the magistrate judge's denial of attorney fees and costs to Palzer.  The court therefore overrules Palzer's Objection No. 12 with respect to the denial of attorney's fees and costs.

# **Attachment 4**

# *Order*

(granting *Motion to Strike Plaintiff's Response
to Defendant's Motion for Summary Judgment*)

**May 1, 2019**
**Dkt. #165**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| MARK ANTHONY PALZER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-CV-00564-GKF-JFJ |
| | ) | |
| COX OKLAHOMA TELCOM, LLC | ) | |
| and COXCOM, LLC d/b/a COX | ) | |
| COMMUNICATIONS TULSA, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

This matter comes before the court on the Motion to Strike Plaintiff's Response to Defendant's Motion for Summary Judgment and Brief in Support [Doc. 141] of defendant CoxCom, LLC d/b/a Cox Communications Tulsa ("Cox"). For the reasons discussed below, the motion is granted.

**I.      Background/Procedural History**

This case has a lengthy procedural history. The court summarizes only those events relevant to the motion to strike. This is an employment discrimination case. Plaintiff asserts claims for discrimination based on age and retaliatory discharge in violation of Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*.; discrimination based on race and retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*; and breach of contract.[1]

---

[1] Plaintiff's Petition for Wrongful Termination and Discrimination in Employment also asserted claims under the Oklahoma Anti-Discrimination Act ("OADA"), 25 Okla. Stat. §§ 1101 *et seq*. In its Opinion and Order dated July 3, 2018, this court dismissed plaintiff's OADA claims. *See* [Doc. 102].

Written discovery in this matter closed on March 1, 2018.  [Doc. 55].  Plaintiff did not propound written discovery requests to defendant.[2]  [Doc. 126, p. 6].  The court permitted discovery to continue until September 4, 2018,[3] for the limited purpose of deposing plaintiff and Cox's FED. R. CIV. P. 30(b)(6) corporate representative.  [Doc. 72].  On August 23, 2018, plaintiff deposed defendant's Rule 30(b)(6) representative, Melissa Mason Cruts.  After the close of discovery, on September 17, 2018, plaintiff filed a Motion for Order Compelling Defendant to Submit for Deposition under FED. R. CIV. P. 30(b)(6) by Presenting a Designee Who is Properly Prepared to Testify Regarding Examination Topic Nos. 3, 5-6, 9, 13, 15, 23, and 25-26.  [Doc. 110].  Therein, plaintiff contended that Cruts was not knowledgeable and prepared to testify as required by FED. R. CIV. P. 30(b)(6) with respect to the disputed topics and therefore sought an order compelling defendant to present "a corporate designee who is fully prepared to answer questions falling within those eight key areas (including those questions that were previously asked, but about which Cox's 30(b)(6) designee lacked – or claimed to lack – sufficient knowledge), and to allow full examination of such designee."  [Doc. 110, pp. 2-3].  Pursuant to 28 U.S.C. § 636, this court referred plaintiff's motion to U.S. Magistrate Judge Jayne.  On October 3, 2018, the parties appeared before the magistrate judge for a hearing on the motion.  At the close

---

[2] Defendant issued written interrogatories and requests for production of documents to plaintiff. Plaintiff failed to timely respond and, February 19, 2018, defendant moved to compel plaintiff's discovery responses, as well as his preliminary witness and exhibit list.  [Doc. 63].  Magistrate Judge Jayne granted defendant's motion to compel [Doc. 84], and sanctioned plaintiff's counsel in the amount of reasonable attorney's fees incurred for preparation of the reply brief in support of defendant's motion to compel and for preparing and attending the March 28, 2018, hearing.  [Doc. 87].

[3] The parties requested agreed extensions on four separate occasions, which the court granted.  *See* [Doc. 75, Doc. 90, Doc. 94, and Doc. 101].

of argument, Magistrate Judge Jayne issued a verbal order from the bench denying plaintiff's motion. [Doc. 121].

The Fourth Amended Scheduling Order provided a dispositive motion deadline of September 18, 2018. [Doc. 101]. Defendant timely filed its motion for summary judgment on that date. [Doc. 114]. Pursuant to Local Civil Rule 7.2(e), plaintiff's response was due on October 9, 2018. That day, plaintiff filed the Unopposed Application for Enlargement of Deadline for Responding to Defendant's Motion for Summary Judgment seeking an additional ten (10) days, until October 19, 2018, to respond to defendant's motion for summary judgment. [Doc. 123]. The application represented as follows:

> 2.    [Since defendant's filing of its motion for summary judgment], Plaintiff's attorney Christopher Camp, a solo practitioner, has had numerous briefing and discovery deadlines (including appellate briefing and out-of-town depositional discovery), court appearances, and additional obligations in his other cases warranting his immediate attention.

> 3.    This *Application* is made so that the undersigned will have adequate time to fully address the allegations and arguments raised by Defendant's *Motion* (which involves complex factual and legal issues to which Plaintiff should be permitted to respond), while continuing to meet the other deadlines set by this Court and other courts.

[*Id.* p. 2]. The court granted plaintiff's application. [Doc. 125].

At 11:58 p.m. on October 18, 2018—the day before plaintiff's response deadline—plaintiff filed an Objection to Magistrate Judge's October 3rd Order Denying Motion to Compel Compliance with FED. R. CIV. P. 30(b)(6). [Doc. 126]. The next day—plaintiff's response deadline—plaintiff filed an Unopposed Application for Additional Enlargement of Deadline for Responding to defendant's Motion for Summary Judgment. [Doc. 128]. The request for additional enlargement of deadline sought one additional business day, or until October 22, 2018, to file a

response to defendant's motion for summary judgment. [*Id.* p. 1]. The application represented as follows:

> 2.    [Since Cox's filing of its motion for summary judgment], Plaintiff's attorney Christopher Camp, a solo practitioner, has had numerous briefing and discovery deadlines (including appellate briefing and out-of-town depositional discovery), court appearances, and additional obligations in his other cases warranting his immediate attention.
>
> ***
>
> 5.    On Thursday, October 18[th], the undersigned was notified that another matter he is handling had been set for expedited hearing, unexpectedly requiring him to divert his attention from the instant matter, to engage in the expedited review of records and preparation of testimony, and to be away from the office and outside the county on Friday (when he otherwise would have been completing the preparation of his Response brief).

[Id. pp. 1-2]. The court granted plaintiff's request for extension of time. [Doc. 129].

At 11:56 p.m. on October 22, plaintiff filed an "Assumed Opposed Motion to Exceed Page Limitation." [Doc. 130]. The motion included the following:

> Due to the hour at which the undersigned attorney **finished preparing** Plaintiff's *Response*, it was not possible for him to communicate with defense counsel for the purpose of ascertaining whether Defendant objects to the instant request to exceed the page limitation set forth in in [*sic*] N.D. LCvR 7.2(c). Accordingly, the Court should assume that Defendant would oppose the relief sought by this *Motion*.

[*Id.* p. 1 (emphasis added)]. The court granted plaintiff's motion to exceed page limit the next morning, October 23. [Doc. 131].

The court received nothing further from plaintiff until 8:31 p.m. on October 31, 2018, when plaintiff filed his response to defendant's motion for summary judgment. [Doc. 135]. However, the response was deficient. Although plaintiff referenced exhibits 14, 75, 79, 80, 83, and 85, plaintiff did not attach these exhibits. Further, the brief's footnotes were smaller than 12 pitch font in violation of LCvR 7.2(c). [*Id.*].

Then, *without seeking leave of the court*, on November 9, 2018, plaintiff filed an Errata/Correction to Pages 3, 14, 15 & 33 of Plaintiff Mark Palzer's Response to Defendant

CoxCom, LLC's Motion for Summary Judgment.  [Doc. 139].  Plaintiff represented the purpose of the errata was "correcting certain typographical omissions and errors" in his response brief.  [*Id.* p. 1].  That same day, November 9, plaintiff filed a "supplement" attaching exhibit nos. 14, 75, 79, 80, 83 and 85.  [Doc. 140].  The supplement attached the following exhibits: (a) Exhibit 14 – map of Tulsa-area zip codes reflecting assignment to Mark, Hunter, Chuck, or Larry; (b) Exhibit 75 – Affidavit of Mark Palzer, dated October 22, 2018; (c) Exhibit 79 – Affidavit of Carissa (Nealis) Paquette, dated November 1, 2018; (d) Exhibit 80 – Affidavit of Matt Hughes, dated November 5, 2018; (e) Exhibit 83 – Affidavit of Melissa Cruts, dated September 18, 2018; and (f) Exhibit 85 – Affidavit of Steven M. Fulps, dated November 8, 2018.  [Doc. 140].  The supplement stated as follows:

> Plaintiff Mark Palzer ("Palzer" or "Plaintiff") hereby supplements his previously-filed *Response to Defendant CoxCom, LLC's Motion for Summary Judgment* [Dkt. #135] by correcting its omission of Exhibit Nos. 14, 75, 79, 80, 83 & 85, all of which were expressly referenced and cited to in such *Response*.

[*Id.*].  Accordingly, plaintiff's response brief was not "complete" until November 9, 2018, almost three (3) weeks after the response deadline.

On November 13, 2018, defendant filed the instant motion to strike.  The next day, on November 14, 2018, the court struck the remaining deadlines included in the Fourth Amended Scheduling Order in light of the motion to strike and plaintiff's objection to the magistrate judge's denial of his motion to compel.  [Doc. 142].

Pursuant to LCvR 7.2, plaintiff's deadline to respond to the motion to strike was Tuesday, December 4, 2018.  Plaintiff did not file a response.  Two days after the deadline, on Thursday, December 6, 2018, at 10:51 p.m., plaintiff filed the Application for Enlargement of Deadline to Respond to Defendant's Motion to Strike, seeking an order granting him until Friday, December

14, 2018 to file a response to defendant's motion to strike.  [Doc. 153].  The application asserted as follows:

> Since the filing of Cox's *Motion to Strike*, Plaintiff's attorney Christopher Camp, a solo practitioner, has had numerous briefing and discovery deadlines, voluminous work to complete in connection with the dissolution of a company currently in receivership, and additional obligations in his other cases warranting his immediate attention.

[*Id.* pp. 1-2, ¶ 2].  The court entered the following minute order granting plaintiff's request:

> Plaintiff Mark Palzer's Application for Enlargement of Deadline to Respond to Defendant's Motion to Strike is granted.  Plaintiff has until 12/14/18 to file his response; Defendant has until 12/28/18 to file its reply.  **No further extensions shall be granted**.

[Doc. 154 (emphasis added)].  Nevertheless, on December 14, 2018—the deadline for plaintiff to respond to the motion to strike—plaintiff filed a Second Application for Enlargement of Deadline to Respond to Defendant's Motion to Strike, seeking an additional extension of time to respond to Monday, December 17, 2018 and citing counsel's "handful of court appearances, several client meetings, and work on certain time-sensitive administrative matters[.]"  [Doc. 159, p. 2, ¶ 4].

On Monday, December 17, 2018, at 4:07 p.m., the court denied plaintiff's second application to extend deadline for failure to demonstrate good cause and based on the court's prior admonition that no further extensions of time would be granted.  [Doc. 160].  Despite this court's order, at 11:58 p.m. that night, plaintiff filed a response to the motion to strike [Doc. 161], which the court struck.  [Doc. 162].  Thus, the motion to strike is ripe for this court's review.

## II.     Motion to Strike Analysis

Federal Rule of Civil Procedure 6 permits the court to extend time to perform an act that must be done within a specified period of time "on motion made after the time has expired if the party failed to act because of excusable neglect."  FED. R. CIV. P. 6(b)(1)(B).  "A finding of excusable neglect depends on four factors: '[1] the danger of prejudice to the [non-moving party],

[2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1253 (10th Cir. 2017) (*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd, P'ship*, 507 U.S. 380, 395 (1993)). However, "[t]he most important factor is the third[.]" *Id.* Absent a showing of excusable neglect, a district court does not abuse its discretion by prohibiting a party from filing an untimely document. *See Ghamrawi v. Case & Assocs. Props. Inc.*, 116 F. App'x 206, 210 (10th Cir. 2004); *Curran v. AMI Fireplace Co. Inc.*, 163 F. App'x 714, 718 (10th Cir. 2006) (finding no abuse of discretion in a district court's decision to strike an untimely summary judgment response brief where counsel failed to abide by specific deadline set by court in minute order); *see also Sizemore v. State of New Mexico Dep't of Labor*, 182 F. App'x 848, 852-53 (10th Cir. 2006) (no abuse of discretion in denying motion for extension of time to respond to summary judgment based on counsel error).[4]

The court first considers the third—and most important—factor, the reason for the delay and whether it was within plaintiff's control. As previously stated, plaintiff did not seek leave of this court to file his response brief on October 31, more than a week after the second extended deadline set by this court. As a result, the court cannot look to any request for extension of time to determine the reason for delay. Nor did plaintiff seek leave to supplement his response brief. The court therefore cannot look to the supplement to understand the basis for plaintiff's delay. Finally, plaintiff failed to timely respond to defendant's motion to strike. Accordingly, Plaintiff

---

[4] "Unpublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A).

offers *no reason* for his failure to file a complete response brief by the October 22, 2018 deadline, despite the court having granted him two extensions to do so.

Plaintiff's failure to timely respond is rendered all the more confusing by counsel's representation in the motion to exceed page limitation that he had "**finished preparing** Plaintiff's Response[.]"  [Doc. 130, p. 1, ¶ 1].  Counsel offered no reason outside his control that prevented him from filing a complete response, with all referenced exhibits, until November 9 (over three weeks after the deadline) if he had, in fact, "finished preparing" that response on October 22.  To the extent plaintiff's counsel would rely on his "voluminous workload" as a sole practitioner (as he had in requesting prior extensions), "[t]he 'usual excuse that the lawyer is too busy . . . can be used, perhaps truthfully, in almost every case.'"  *Freitag v. Sonic Auto., Inc.*, No. 04-CV-164-JHP-FHM, 2006 WL 2193340, at *2 (N.D. Okla. Aug. 1, 2006) (quoting *Md. Cas. Co. v. Conner*, 382 F.2d 13, 17-18 (10th Cir. 1967)).  Plaintiff offers nothing to suggest that the circumstances of this case are so unique to render his failure to timely respond excusable.  Rather, the procedural history of this matter suggests a pattern and practice by plaintiff's counsel of disregarding the Federal Rules of Civil Procedure and the Local Civil Rules.[5]  Accordingly, the third factor weighs strongly in favor of striking plaintiff's response brief.[6]

---

[5] Nor does counsel's pattern of conduct appear to be limited to this case.  *See* 16-CV-0078-CVE-TLW.

[6] Even if the court were to consider the reason offered in plaintiff's stricken response to defendant's motion to strike, the third factor weighs in favor of striking plaintiff's response to defendant's motion for summary judgment.  Therein, Camp explains that he was unaware that the court granted his motion for leave to exceed page limit because, "[a]lthough he does not know for certain, counsel believes that the CM-ECF notice regarding the Court's order may have inadvertently been clicked along with another e-mail and/or moved to the 'read' folder without counsel noticing." [Doc. 161, p. 6].  Camp explains that he received a voicemail from the court regarding his tardy response on October 29 (which he did not listen to until the next day).  Camp represents:

With respect to the fourth factor, circumstances surrounding plaintiff's response suggest bad faith.  As previously stated, on October 22, 2018, plaintiff's counsel represented to the court that he had "finished preparing" plaintiff's response brief.  Yet, plaintiff did not file a response until nine (9) days later.  Even then, the response was incomplete.  Although referenced in the response brief, plaintiff did not file exhibits 5, 75, 79, 80, 83, and 85 until nine days after that, on November 9.  More problematic, however, three of the exhibits—exhibits 79, 80, and 85—are affidavits dated *after* October 31, the date on which plaintiff filed his response brief.  These circumstances strongly suggest that plaintiff's counsel engaged in questionable, if not bad faith conduct, and delayed filing his response brief in order to obtain additional time to complete the brief and exhibits without leave of this court.[7]  Thus, the fourth factor weighs in favor of striking plaintiff's response to defendant's motion for summary judgment.

---

Upon listening to the message, counsel immediately contacted the judge's office [see Ex. H], informing the bailiff or assistant that he had not seen the CM-ECF notice (which did not set a date or time certain for filing) *and that he would immediately begin finalizing the brief and attachments for filing*.  Plaintiff then filed the brief and attachments the following business day.

[Doc. 161, p. 7 (emphasis added)].  The stricken response brief is not persuasive for three separate reasons.  First, the court did not include "a date or time certain for filing" plaintiff's response brief because a deadline existed—October 22.  If plaintiff required additional time, he should have requested an extension, as well as leave to exceed the page limitation.  Second, if plaintiff had, in fact, "finished preparing Plaintiff's Response" as he represented in his motion to exceed page limitation, he offers nothing to explain why he required almost two full business days to finalize and file the briefing and attachments.  Third, plaintiff's response provides no explanation for his failure to attach all referenced exhibits to the response brief filed on October 31, 2018, or why he required until November 9, 2018 to provide the court and opposing counsel with a complete response brief.

[7] This is despite Camp's October 22 representation to the court that he had "finished preparing Plaintiff's Response." [Doc. 130, p. 1, ¶ 1].  Plaintiff's stricken response to defendant's motion to strike also contains embellishments—if not misrepresentations—of the truth.  Plaintiff's counsel states that, in this case, he did not "fail to file Plaintiff's exhibits contemporaneously with, and as part of, Plaintiff's summary judgment response brief," "file a 'corrected response' (or any supplemental pleading that materially added to Plaintiff's original summary judgment response

Finally, with respect to the first and second factors, the court notes that plaintiff's delinquencies have resulted in prejudice to the defendant and effected the judicial proceedings, as the court found it necessary to strike all remaining scheduling order deadlines a month prior to the hearing on dispositive motions. *See* [Doc. 101 and 141].

Based on the foregoing, all four of the relevant factors weigh in favor of striking plaintiff's response to defendant's motion for summary judgment, and the response (including the errata/correction and supplement) is stricken. Striking a summary judgment response is not something this court takes lightly. However, if ever circumstances existed to warrant the action, this is such a case. Throughout the course of this litigation, plaintiff's counsel has demonstrated a disregard for the Federal Rules of Civil Procedure and Local Civil Rules, as well for this court and opposing counsel. Plaintiff's response [Doc. 135, 139, and 140] is stricken.

The court emphasizes that this ruling is independent of its determination of defendant's motion for summary judgment. As it must, this court will examine defendant's motion "to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).

---

brief)," or "subsequently add to Plaintiff's original responses to Cox's 'undisputed material facts.'" [Doc. 161, p. 2]. However, plaintiff did, in fact, fail to file all of his exhibits contemporaneously with the response brief and filed a "supplement" that included exhibits created after his response brief was filed. [Doc. 140]. Significantly, the stricken response to defendant's motion to strike does not explain or address the late-dated exhibits. Further, plaintiff filed the Errata/Correction that included additional citation to the record to dispute defendant's statement of material fact no. 30, and included additional citation to the record in support of plaintiff's additional fact no. 32. *See* [Doc. 139-1, pp. 2 and 4].

## III.    Sanctions

Defendant seeks an award of its attorney fees and costs incurred because of plaintiff's failure to timely respond.  Pursuant to FED. R. CIV. P. 16(f), the court may order the party, or its attorney, to pay "the reasonable expenses—including attorney's fees—incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust."  FED. R. CIV. P. 16(f)(2).  *See also* LCvR 7.2(f) ("[I]n the discretion of the Court, the party failing to respond shall be subject to sanctions, including but not limited to all attorney fees and costs incurred by the moving party in connection with such failure to timely oppose the motion.").  Under the rule, "[i]f the fault lies with the attorneys, that is where the impact of sanction should be lodged."  *In re Baker*, 744 F.2d 1438, 1442 (10th Cir. 1984).

Under the circumstances, plaintiff's failure to respond to defendant's motion for summary judgment was not substantially justified.  Thus, plaintiff is subject to sanctions.  However, based on the information before it, the court concludes the fault lies squarely with plaintiff's counsel and therefore that is where the impact must be lodged.  Plaintiff's counsel shall pay all attorney fees and costs incurred by defendant in connection with plaintiff's tardy and incomplete response.  Defendant shall submit evidence of its fees and costs within thirty (30) days of this order.

## IV.    Conclusion

WHEREFORE, Defendant CoxCom, LLC's Motion to Strike Plaintiff's Response to Defendant's Motion for Summary Judgment and Brief in Support [Doc. 141] is granted.

The Court Clerk is hereby directed to strike and publicly seal from view plaintiff's response brief [Doc. 135], plaintiff's Errata Correction [Doc. 139], and plaintiff's supplement [Doc. 140].

DATED this 1st day of May, 2019.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

- 11 -